IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

**KOCH SUPPLY & TRADING, L.P.,**

                                        **Plaintiff**

**v.**                                                    Civil Action No. 4:08−cv−00377

**BP PRODUCTS NORTH AMERICA, INC.,**
                                        **Defendant.**

---

## DEFENDANT BP PRODUCTS' MOTION TO STAY PROCEEDINGS PENDING ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

Defendant BP Products North America, Inc. ("BPPNA") respectfully moves for an order staying all proceedings in this action until the Judicial Panel on Multidistrict Litigation ("JPML") has determined whether this case should be transferred to the Northern District of Illinois, pursuant to 28 U.S.C. § 1407, so that this case may be administered along with the eighteen other actions that allege the same causes of action arising out of the same set of alleged facts (the "Related Cases"). In support of this Motion, BPPNA states as follows:

1.      This case is one of 19 related cases that have been filed against BP Products North America, Inc. and its parent company, BP America, Inc. Seventeen of these cases are putative class actions (some of which seek certification of a class that would include plaintiff Koch) that are currently pending in the United States District Court for the Northern District of Illinois before the Honorable James Zagel. An eighteenth individual action was filed on February 15, 2008 in the Northern District of Illinois. The eighteen Related Cases are listed in Exhibit 1 hereto.

2.      All nineteen related cases stem from a single action filed against BPPNA on June 28, 2006 in the Northern District of Illinois by the United States Commodity Futures Trading

Commission ("CFTC").    Captioned *U.S. Commodity Futures Trading Commission v. BP Products North America, Inc.*, No. 06 CV 3503 (N.D. Ill.) ("*CFTC v. BP Products*") (attached as Ex. No. 2 hereto), that case alleged that BPPNA: (i) attempted to corner the market for TET propane[1] in April 2003 (*CFTC v. BP Products* Compl. ¶ 6); (ii) built a sizable "long" position during January 2004 in physical February 2004 TET propane (*id.* at ¶ 49); (iii) "cornered" the February 2004 TET physical propane market (*id.* at ¶¶ 1, 3); and (iv) was able to manipulate the price of February 2004 TET physical propane (*id.* ¶ 1).

3.    Within one day of the CFTC's filing *CFTC v. BP Products*, private plaintiffs began filing tag-along actions against BPPNA based upon the same allegations of the CFTC's complaint, and indeed often parroting the CFTC's allegations verbatim.

4.    Of the Related Cases, two (*Ridgway* and *White*) were originally filed in jurisdictions other than the Northern District of Illinois.    Although the *Ridgway* plaintiffs and BPPNA initially requested that the JPML transfer and centralize these related actions, counsel for Ridgway ultimately agreed to voluntarily transfer the *Ridgway* and *White* cases to the Northern District of Illinois for consolidation with the other Related Cases.    Accordingly, the JPML issued an Order deeming the Motion for Transfer withdrawn, and subsequently the *Ridgway* and *White* cases were transferred to the Northern District of Illinois on November 3, 2006 (*see* Transfer Orders, Ex. No. 3).    No other related case was filed in any jurisdiction other than the Northern District of Illinois until this action was filed in February 2008.

5.    On September 7, 2006, plaintiffs in several of the Related Cases pending in the Northern District of Illinois filed a Motion for Finding of Relatedness, in which they requested that all of the Related Cases pending in the Northern District of Illinois be transferred to a single district judge for pre-trial proceedings.    (Docket report, Ex. No. 4.)    The Motion was granted, and all of the Related Cases were eventually transferred to Judge Zagel (the district judge to whom

---

[1]    TET refers to the Texas Eastern Transmission Corporation.    The term "TET propane" refers to propane that is deliverable at the Texas Eastern Products Pipeline Co., LLC ("TEPPCO") storage facility located in Mont Belvieu, Texas or anywhere within the TEPPCO system.    (*CFTC v. BP Products* Compl., Glossary.)

the first-filed Related Case was originally assigned). The following week, other plaintiffs sought appointment of Interim Class Counsel pursuant to Federal Rule of Civil Procedure 23(g). (*Id.*) On September 19, 2006 and October 17, 2006, Judge Zagel appointed separate Interim Class Counsel for "direct purchaser" plaintiffs and for "indirect purchaser" plaintiffs. (Ex. No. 5, 9/19/2006 Order; Ex. No. 6, 10/17/2006 Order.) Thereafter, each set of Interim Class Counsel proposed Case Management Orders governing various pre-trial issues in the Related Cases, which were granted. (Ex. No. 7, Indirect Purchaser CMO; Ex. No. 8, Direct Purchaser CMO.)

6.    The present case -- constituting the eighteenth case to be filed subsequent to the filing of the *CFTC* case -- was filed in this Court on February 1, 2008. When the *Koch* case was filed, the previously-filed seventeen Related Cases had already been consolidated and pending before Judge Zagel in the Northern District of Illinois, most for nearly one and a half years.

7.    BPPNA believes that the *Koch* case should be transferred to the Northern District of Illinois and there consolidated with the other previously-filed Related Cases. Therefore, BPPNA has requested that the JPML transfer and consolidate this and the Related Cases in the United States District Court for the Northern District of Illinois. BPPNA filed its Motion to Transfer before the JPML on February 28, 2008. (*See* Ex. No. 9 hereto).

8.    This Court has the authority to stay proceedings in this case pending the JPML's transfer and consolidation of the actions. *See Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for litigants."); *see also Trosclair v. Medtronic, Inc.,* No. 07-7565, 2008 WL 89662, *1 (E.D. La. Jan. 7, 2008) ("A district court has inherent power to stay proceedings."); *Miranda v. Ocwen Financial Corp.*, No. SA-07-CV-0034, 2007 WL 962959, *1 (W.D. Tex. Mar. 30, 2007) (noting "the inherent authority of the Court to stay the proceedings before it" and that the court "has sole discretion to stay proceedings when it serves the interests of judicial economy and efficiency").

9.    Local federal courts have recognized three factors in deciding motions to stay pending Judicial Panel decisions on Motions to Transfer: "(1) the hardship and inequity to the

moving party if the action is not stayed, (2) the potential prejudice to the non-moving party, and (3) the judicial resources that would be saved by avoiding duplicative litigation if the cases are in fact consolidated." *U.S. Bank v. Royal Indem. Co.*, No. CIV.A.3:02-CV-0853-P, 2002 WL 31114069, *2 (N.D. Tex. Sept. 23, 2002). Courts in this Circuit (and in this judicial district in particular) have consistently granted Motions to Stay while one of the parties seeks transfer of the case to an MDL proceeding. *See Hernandez Castellanos v. Bridgestone Corp.*, 215 F. Supp.2d 862, 866-67 (S.D. Tex. 2002) (granting motion to stay pending determination of JPML on Motion to Transfer); *Morales v. Merck & Co., Inc.*, No. H-07-0599, 2007 WL 655714, at *1 (S.D. Tex. Feb. 28, 2007) (same); *see also Trosclair v. Medtronic, Inc.*, No. 07-7565, 2008 WL 89662, at *1 (E.D. La. Jan. 7, 2008) (same); *Senia v. Pfizer, Inc.*, No. 06-1997, 2006 WL 1560747, at *4 (E.D. La. May 23, 2006) (same); *Scott v. Bayer Corp.*, No. Civ.A. 03-2888, 2004 WL 63978, at *2 (E.D. La. Jan. 12, 2004) (same); *Kiffe v. Bristol-Myers Squibb*, No. Civ.A. 03-107, 2003 WL 1462839, at *1-2 (E.D. La. Mar. 19, 2003) (same).

10.    Plaintiff Koch asserts the same claims that are presented in the other direct purchaser Related Cases, and in fact is a member of several of the putative classes in the Related Cases. Any motion practice or discovery in the *Koch* or the Related Cases will involve the same issues of fact and law.

11.    Given the essentially identical claims and issues of fact and law, BPPNA would be prejudiced if it were required to litigate Koch's claims separately from the claims of other putative class members, and in different jurisdictions. Federal courts have recognized that a defendant in such circumstances is prejudiced by the "enormous waste of time, money, and judicial resources associated with repetitive and overlapping discovery, as well as undue hardship on the parties and witnesses." *See U.S. Bank*, 2002 WL 31114069 at *2.

12.    A stay of these proceedings pending a decision by the JPML is in the interests of judicial economy because it would avoid duplicative efforts, preserve valuable judicial resources, and prevent or avoid conflicting rulings on pretrial issues. Absent a stay, disputes over discovery would be largely duplicative and district courts of coordinate jurisdiction deciding discovery

disputes may reach contradictory conclusions.  Further, by granting a motion to stay, "the Court will avoid the unnecessary waste of judicial resources if the MDL Motion is ultimately granted. If the MDL Motion is granted, all of the Court's time, energy, and acquired knowledge regarding this action and its pretrial procedures will be wasted." *See U.S. Bank*, 2002 WL 31114069 at *2.

13.     Finally, a stay will work no prejudice to plaintiff in this case.  Discovery has not yet commenced in the present case.  There has been no production of discovery and no factual or legal issues have been adjudicated to date.  Koch waited four years after the conduct at issue occurred, and over one and a half years after most of the Related Cases were filed, to bring a suit. A temporary stay while the JPML rules will work no prejudice on Koch.

WHEREFORE, BPPNA respectfully moves for an order staying all further proceedings in this action until the Judicial Panel on Multidistrict Litigation determines whether this case should be transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1407.

Date:   February 29, 2008

Respectfully submitted,

/s/ Thomas T. Hutcheson
Thomas T. Hutcheson
Federal Admission No. 4823
WINSTEAD PC
1100 JPMorgan Chase Tower
600 Travis Street
Houston, TX 77002
713.650.2717 Direct
713.650.2400 Fax

WINSTEAD PC
1100 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
713.650.400
713.650.2400 FAX

RICHARD C. GODFREY, P.C.
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illionis 60601-6636
312.469.7012
312.846.9139 Fax

***Attorney in Charge for Defendant BP
Products North America Inc.***

## CERTIFICATE OF CONFERENCE

On February 25, 2008, I, David Zott, attorney for Defendant BP Products North America Inc. ("BPPNA"), conferred with Mark Harwell, attorney for Plaintiff Koch Supply & Trading, LP, regarding the stay that is the subject of the present MOTION TO STAY ALL PROCEEDINGS PENDING ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION.  Despite best efforts counsel have not been able to resolve the matters presented.

/s/ David J. Zott
David J. Zott, P.C
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601-6636

*Attorney for BP Products North America, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **DEFENDANT BP PRODUCTS NORTH AMERICA INC.'S MOTION TO STAY ALL PROCEEDINGS PENDING ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION** was filed electronically on February 29, 2008, and will, therefore, be served electronically upon:

**Mark C. Harwell**
**Attorney-in-charge**
State Bar No. 09191700
Southern District of Texas ID 0772
**COTHAM, HARWELL & EVANS**
A Professional Corporation
1616 S. Voss, Suite 200
Houston, Texas 77057
Telephone: (713) 647-7511
Facsimile: (713) 647-7512
mharwell@cothamharwellevans.com

**ATTORNEYS FOR PLAINTIFF**

/s/ Robert T. Montoya
Robert  J. Montoya
WINSTEAD PC
1100 JPMorgan Chase Tower
600 Travis
Houston, Texas 77002

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

KOCH SUPPLY & TRADING, L.P.,

Plaintiff

v.                                                     Civil Action No. 4:08−cv−00377

BP PRODUCTS NORTH AMERICA, INC.,

Defendant.

---

**EXHIBIT 1**
**TO DEFENDANT BP PRODUCTS' MOTION TO STAY PROCEEDINGS PENDING
ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

Listed below are the seventeen Related Cases that are currently pending before in the
United States District Court for the Northern District of Illinois, before the Honorable
James Zagel.

- *Terry v. BP Products North America, Inc.*, No. 06 CV 3551, filed June 29, 2006 in the Northern District of Illinois.

- *Dennison v. BP Products North America, Inc., et. al.*, No. 06 CV 3541, filed June 29, 2006 and amended June 30, 2006 in the Northern District of Illinois.

- *Levin v. BP Products North America, Inc.*, No. 06 CV 03570, filed June 30, 2006 in the Northern District of Illinois.

- *SchagrinGAS Co. v. BP Products North America, Inc.*, No. 06 CV 3621, filed July 6, 2006 in the Northern District of Illinois.

- *Withum v. BP Products North America, Inc.*, No. 06 CV 3744, filed July 11, 2006 in the Northern District of Illinois.

- *Styer Propane, LLC v. BP Products North America, Inc.*, No. 06 CV 3871, filed July 18, 2006 in the Northern District of Illinois.

- *Sydor v. BP Products North America, Inc.*, No. 06 CV 4188, filed August 3, 2006 in the Northern District of Illinois.

- *Cassells v. BP Products North America, Inc.*, No. 06 CV 3837, filed July 14, 2006 in the Northern District of Illinois.

- *Nebel v. BP Products North America, Inc., et al.*, No. 06 CV 4363 , filed August 11, 2006 in the Northern District of Illinois.

- *White v. BP Products North America, Inc.*, filed July 14, 2006 in District Court of Caddo County, Oklahoma, removed to the Western District of Oklahoma on August 16, 2006, transferred to the Northern District of Illinois and assigned Case No. 06 CV 6994 on November 3, 2006, and consolidated with the other Related Cases on December 28, 2006.

- *Ridgway v. BP Products North America, Inc.*, filed July 18, 2006 in the Western District of Oklahoma, transferred to the Northern District of Illinois on November 3, 2006, assigned No. 06 CV 6108, and consolidated with the other Related Cases on January 11, 2007.

- *Plaut v. BP Products North America, Inc. et al.*, No. 06 CV 4577, filed August 23, 2006 in the Northern District of Illinois.

- *Mowers v. BP Products North America, Inc.*, No. 06 CV 4680, filed August 29, 2006 in the Northern District of Illinois.

- *Halpern v. BP Products North America, Inc. et al.*, No. 06 CV 4736, filed August 31, 2006 in the Northern District of Illinois.

- *Meharg v. BP Products North America, Inc. et al.*, No. 06 CV 5293, filed September 29, 2006 in the Northern District of Illinois.

- *Parke J. Patten, Inc., d/b/a Patten Inc. or Patten's Gas v. BP Products North America, Inc.*, No. 06 CV 5325, filed September 29, 2006 in the Northern District of Illinois.

- *Guin v. BP Products North America, Inc.*, No. 07 CV 3531 (filed June 22, 2007 in the Northern District of Illinois.

- *Amerigas Propane, L.P. et al. v. BP North America, Inc., et al.*, No. 08 C 981, filed February 15, 2008 in the Northern District of Illinois.

**EXHIBIT 2**

JUDGE CASTILLO
MAG. MASON

**FILED**

J N

JUN 2 8 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
**FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**BP PRODUCTS NORTH AMERICA, INC,**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CIVIL ACTION NO.**

**Complaint for Injunctive and
Other Equitable Relief and
Civil Monetary Penalties
Under the Commodities Exchange
Act**

The United States Commodity Futures Trading Commission ("Commission" or "CFTC"),

by its attorneys alleges as follows:

## I.    SUMMARY

1.    As is more fully alleged below, Defendant BP Products North America, Inc.

("BP" or "Defendant"), by and through its employees, including but not limited to, Donald

Cameron Byers ("Byers"), Martin Marz ("Marz"), James Summers ("Summers"), Mark Radley

("Radley"), Dennis Abbott ("Abbott") and Cody Claborn ("Claborn") among others, has

engaged in acts and practices that constitute violations of the Commodity Exchange Act, as

amended (the "Act"), 7 U.S.C. §§ 1 *et seq.* (2002).  In short, BP unlawfully attempted to

manipulate and did manipulate the price of February 2004 TET physical propane by cornering

the market for February 2004 TET physical propane.  Further, BP also attempted to manipulate

the price of April 2003 TET physical propane, again by seeking to corner the April 2003 TET

physical propane market.

2.    A "corner" is where an entity seeks to, and holds, a dominant or controlling position in a commodity market for the purpose of being able to command or dictate the price at which it will sell the commodity.[1]

3.    Radley, while employed by BP, developed and directed the execution of a speculative trading strategy in which BP cornered the February 2004 "TET" physical propane market. *See* Attachment 1, *Glossary.* Radley accomplished this by directing other BP employees to establish a dominant and controlling long position in February 2004 TET physical propane by purchasing an overwhelming amount of physical propane that required delivery of TET physical propane by the end of February 2004. Radley directed other BP employees to establish a position in February 2004 TET physical propane which exceeded all available inventory of TET propane. BP employees followed Radley's instructions. As a result, BP cornered the February 2004 TET propane market.

4.    After acquiring this dominant and controlling position in the February 2004 TET physical propane market, Radley directed other BP employees to sell a portion of the February 2004 TET propane BP acquired to market participants who were "short" to the market at prices dictated by BP. Because BP possessed a dominant and controlling position in February 2004 TET propane, many of the "shorts" on at least February 27, 2004 had no choice but to buy February 2004 TET propane from BP. Because BP possessed a dominant and controlling position in February 2004 TET physical propane, BP, by and through its employees, was able to dictate the price at which BP would sell the February 2004 TET propane to the shorts on at least February 27, 2004.

---

[1] Individuals, including BP employees discussed in this complaint, sometimes use the term "squeeze" as a synonym for a "corner."

2

5.     Radley executed BP's manipulation and corner of the February 2004 TET physical propane market with the knowledge, advice, and consent of Byers, Marz, and Summers, all of whom had direct or indirect control over Radley and other BP employees. *See* Exhibit A.

6.     February 2004 was not the first time that BP and Radley engaged in an effort to corner the TET physical propane market. BP and Radley attempted to manipulate the price of TET physical propane in April 2003 through a similar strategy of taking a dominant and controlling long position in April 2003 TET physical propane. Indeed, Radley described the April 2003 TET propane trading strategy as a "trial run" of the February 2004 TET trading strategy.

7.     As more fully described below, the actions of Radley and other BP employees acting at his direction in the TET physical propane market between March 2003 and July 2004 ("relevant period") violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 6(c), 6(d), 13(a)(2). Byers, Marz and Summers had control over the activities of Radley and other BP employees in February 2004. Because Radley and other BP employees acting at his direction violated the Act by engaging in conduct that was within the scope of their employment at BP, BP is vicariously liable for all violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002).

8.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action to enjoin such acts and practices, and compel compliance with the Act. In addition, the Commission seeks civil penalties and such other ancillary relief as the Court deems necessary or appropriate under the circumstances, including, but not limited to, disgorgement of unlawful profits, restitution and damages.

3

9.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendant will continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person, or, to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

11.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that Defendant is found in, inhabits and transacts business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

## III.    THE PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* One of its core responsibilities is to protect the public interest by deterring and preventing price manipulations of the commodity markets or futures markets, or other disruptions to market integrity. 7 U.S.C. § 3 (2002).

13.    Defendant **BP PRODUCTS NORTH AMERICA, INC.** ("BP") is a wholly owned subsidiary of BP plc, one of the largest energy companies in the world. BP is also the largest supplier of natural gas liquids, including propane, in North America. BP's North

4

American Headquarters are located at 28100 Torch Parkway, Warrenville, Illinois.  One of BP's business units is BP's North America Gas and Power business unit ("NAGP").

## IV. RELEVANT INDIVIDUALS

14.    Donald Cameron Byers ("Byers") was the Chief Operating Officer for BP in February 2004 and April 2003 and is currently the President and CEO of BP's NAGP.

15.    Martin Marz ("Marz") was the Compliance Manager for BP's NAGP during the relevant period.

16.    James Summers ("Summers") was the Vice President of Natural Gas Liquids Trading for BP in February 2004 and reported directly to Byers.

17.    Mark Radley ("Radley") was the Trading Manager of Natural Gas Liquids Trading for BP in February 2004 and April 2003 and reported directly to Summers.

18.    Dennis Abbott ("Abbott") was the self-described "second-in-command" on the natural gas liquids ("NGL") Trading Bench in February 2004, and was perceived as the trading bench leader in Radley's absence.  Abbott traded all Natural Gas Liquids ("NGLs"), and participated in the execution of BP's February 2004 TET propane strategy.  Abbott was placed on paid administrative leave during the Division's investigation in this matter, and was recently fired by BP for his actions in connection with BP's February 2004 TET propane trading strategy.

19.    Cody Claborn ("Claborn") was the primary trader for TET propane in February 2004 and participated in the execution of BP's February 2004 TET propane strategy.  Claborn was placed on paid administrative leave during the Division's investigation in this matter, and was recently fired for his actions in connection with BP's February 2004 TET propane trading strategy.

## V.    FACTS

**A.    The TET Propane Market and Other Propane Markets**

20.    Propane is a by-product of natural gas processing and petroleum refining. Because propane is a by-product of these two processes, the volume of propane available from these sources will not necessarily immediately adjust to changes in the supply and demand of propane.

21.    The term "TET" is an acronym for Texas Eastern Transmission Corporation. The phrase "TET propane" refers to propane that is deliverable at the TEPPCO storage facility in Mont Belvieu, Texas or anywhere within the TEPPCO system. "TEPPCO" is an acronym for Texas Eastern Products Pipeline Co, LLC. The TEPPCO storage facility is the primary source for propane used in residential, commercial, and agricultural heating in the northeastern United States via the TEPPCO pipeline.

22.    The TEPPCO pipeline runs from Mont Belvieu, Texas up through Ohio, into New York, Pennsylvania and Illinois. The TEPPCO pipeline is the only pipeline that transports propane from Mont Belvieu to the Northeast and Midwest regions of the United States. Only propane within the TEPPCO system (comprised of its storage cavern and its pipeline) is TET propane. At any given time, the total TEPPCO system inventory of propane represents the total available supply of TET propane.

23.    The TEPPCO pipeline is unidirectional, meaning that the TEPPCO pipeline only flows in a single direction, *i.e.,* it transports propane out of Mont Belvieu, Texas. Once propane has left the TEPPCO storage facility and enters the pipeline, the propane cannot be moved back into the TEPPCO storage facility via the pipeline. Prices of TET propane affect the price of

6

propane purchased by consumers, including residential consumers in Illinois, at locations along
the TEPPCO pipeline

24.    Inventories in TET propane are generally built up during the spring and summer
months and typically peak by the end of September. During the winter heating season, TET
propane inventory withdrawals occur. TET propane inventories are typically lowest at the end
of the home heating season in February and March.

25.    TET propane is a type of propane recognized as being distinct from other types of
propane by the propane industry. The market for TET propane is distinct from markets for other
types of propane. The propane industry recognizes that TET propane has its own market price
distinct from the prices for other types of propane. TET propane is a commodity in interstate
commerce.

26.    Aside from TEPPCO, Mont Belvieu has other individual, privately owned storage
caverns. Also located in Mont Belvieu are storage facilities owned and operated by Enterprise
Products Partners, LP and during the relevant period Dynegy Liquids Marketing and Trading,
LP. As noted above, propane in the TEPPCO storage facility is identified as "TET" propane by
the propane industry. By comparison, propane in other storage facilities at Mont Belvieu is
designated as "non-TET" propane by the propane industry.

27.    The United States is a net importer of propane. Imports provide an important
source of supply when consumption exceeds available supplies of propane from domestic
production and inventories.

28.    Propane demand in the United States comes from several different sectors, but the
largest sectors are the residential/commercial heating sector and petrochemical industry which
uses propane in the manufacturing of plastics.

7

29.    Residential/commercial demand for propane constitutes approximately 43% of domestic demand for propane. Because the majority of this usage is for heating, the demand from this sector is highly seasonal and dependent on weather. Residential and commercial consumption of propane for heating is most prevalent in the Northeast and upper Midwest parts of the United States. Propane is the fourth most important source of residential heating in the United States. As of 1996, approximately 8.1 million households depended on propane for one use or another (excluding propane gas grills), and by 2003 approximately 6.88 million households used propane as their primary heating fuel. Propane is most commonly used to provide energy in areas not serviced by natural gas distribution systems, *i.e.*, propane is commonly used in rural regions.

30.    As noted above, the primary source of propane for residential heating in the Northeast United States is the TEPPCO system. Because it is a heating fuel, demand from the residential and commercial markets tends to be inelastic, or price insensitive. When prices for propane increase quickly, consumers of propane in the residential/commercial sector are generally unable to switch to other fuel sources for heating and, therefore, must either pay the price being offered to them by propane merchants, or forego using propane as a source of heating.

**B.    Propane Trading**

31.    Producers, marketers and consumers of propane trade propane contracts in a variety of ways, including propane futures contracts on the New York Mercantile Exchange ("NYMEX") and other types of contracts in the over-the-counter ("OTC") market.

32.    In the OTC market, propane is traded through direct, bilateral transactions between counterparties, through voicebrokers, and on an electronic facility known as

8

"Chalkboard." Voicebrokers generally do not take title to propane and serve primarily to

negotiate and execute deals between willing buyers and willing sellers. Similarly, Chalkboard

allows parties to post bids and offers and then execute transactions in propane. Chalkboard also

does not take title to propane.

33.    Prices of TET propane affect the price of the NYMEX futures contract for

propane, in part, because the NYMEX propane contract provides for delivery of propane at

TEPPCO.

34.    In the OTC market, propane trades are generally in lots of 1000 barrels ("bbls").

Each barrel is the equivalent of 42 gallons of propane. Prices for propane trades or contracts are

quoted, negotiated and executed in $1/8^{th}$ cent per gallon ("cpg") increments.

35.    The Oil Price Information Service ("OPIS") publishes a daily newsletter which

includes, among other things, market commentary and a daily index of prices for both TET

propane and non-TET propane. The prices published by OPIS include a daily low, a daily high

and a simple average of these two prices which is known as the "OPIS average." The propane

industry uses OPIS as a source for determining the price at which they buy and sell TET

propane.

36.    In the OTC market, propane trades may either be settled through physical delivery

or settled financially, i.e., money is exchanged between the parties.

37.    Propane trades in the OTC market may also be designated as "any" or "wet." A

transaction involving "any" propane calls for delivery of the propane at any time during the

contract month up until the last day of the contract month.

38.    A transaction involving "wet" propane requires delivery of the propane on a

specific date within the contract month.

## C.   BP's Corporate Structure and Business in Propane

39.   BP is a producer, marketer and consumer of commercial propane in the United States. BP's production, transportation and retail sales of commercial propane are handled by BP's Natural Gas Liquids Business Unit ("NGLBU").

40.   According to BP's website, it is the "#1 supplier of NGLs in North America, marketing over 500,000 barrels per day of liquids including propane and butane." BP's trading of propane is handled by BP's NAGP. During the relevant period, all relevant individuals were employed with the BP's NAGP.

41.   Within the NAGP, BP's trading of propane throughout North America was handled by the Natural Gas Liquids Trading Bench ("Trading Bench"). The Trading Bench bought and sold propane in the name of BP.

42.   Consistent with industry practice, during the relevant period, BP recorded the Trading Bench members' telephonic communications. BP traders are aware that their conversations are recorded.

43.   On or about February 2004, Summers was the Vice President of Natural Gas Liquids Trading and Marketing. As Vice President, Summers had supervisory responsibility for the trading activities of the Trading Bench. Summers directly or indirectly controlled Radley's conduct described in this complaint.

44.   During the relevant period Radley was the Trading Bench Manager. As the Trading Bench Manager, Radley was responsible for the management of "all aspects of the day-to-day trading activities" of the Trading Bench. Radley was also responsible for monitoring and enforcing "compliance with all internal assurance and controls, as well as external regulations and securities laws."

10

45.    During the relevant period, employees Abbott, Claborn, Carrie Kienenberger ("Kienenberger") and Tim Morby ("Morby") traded TET propane on behalf of BP and at Radley's direction.

46.    During the relevant period, Marz was the Compliance Manager for the NAGP. Marz was responsible for ensuring that the NAGP was complying with all appropriate rules and regulations, including laws, trading ethics, and company policies regarding the manipulation of prices.

47.    During the relevant period, Byers was the Chief Operating Officer of the NAGP. Byers was responsible for, among other things, the development, implementation, and execution of trading and marketing strategies. Byers was also responsible for the oversight for the NAGP's risk management and for ensuring that appropriate trading processes, systems and controls were in place.

**D.    BP Corporate Policies on Market Manipulation**

48.    At all times relevant to this lawsuit, BP maintained a company policy entitled "Guidelines for Conduct by BP's Energy Market Participants." Incorporated in that policy is a section on "Price Manipulation or Market Abuse." This section specifically prohibits manipulation of prices.

**E.    BP's February 2004 TET Propane Trading Strategy – Development and Description**

49.    Throughout the month of January 2004, BP began building a sizable "long" position in physical February 2004 TET physical propane. A company is "long" if its overall obligation to buy and receive propane is greater than its obligation to sell and deliver propane.

50.    In the month of January 2004, Radley made several statements indicating that he perceived that the propane market was vulnerable to a manipulation. For example, on January 8,

11

2004, in an audiotaped conversation with other BP employees, Radley stated that the propane
market was "vulnerable to a squeeze." On January 13, 2004, in a conversation with another BP
employee, Radley stated that the propane market was "tight enough that if someone wanted to
play games with it, potentially they could."

51.     However, during January 2004, there were also forecasts for substantial imports of
propane, due to arrive in the Gulf Coast and at import terminals located along the East Coast to
supplement what BP's employees identified as a "tight" market. For example, on January 28, 2004,
BP received a published report from Commercial Services Company, Ltd. which forecasted
approximately 3.5 million barrels of propane destined for the United States in February 2004.

52.     Throughout the month of January 2004, BP increased its position in February 2004
TET propane. As a result, at the beginning of February 2004, BP held a significant long position in
February 2004 TET propane. According to Summers, "Entering Feb[ruary] NAGP owned nearly
50% of available physical propane bbls [barrels] at the TET location." Additionally, BP had a
significant position in financial transactions which were valued based on the price of February
2004 TET propane. Thus, coupled with its long position in physical February TET propane, BP
had a financial interest in higher prices of February 2004 TET propane.

53.     While BP increased its position of February 2004 TET physical propane during
the month of January 2004, the market price of February 2004 TET propane declined.

54.     On January 9, 2004, the OPIS Average price for February 2004 TET propane was
74.5 cpg. However, by February 4, 2004, the OPIS Average price for February 2004 TET
propane had fallen to 63.5625 cpg. In light of the price decline, on February 3, 2004, Radley
observed that "propane prices have been dropping like a stone." He further noted that BP was
"hurting" because of the price decline. Similarly, on February 4, 2004, Radley sent out, via e-

12

mail, a market assessment of the propane market at that time. Among other statements about the

propane market, Radley wrote:

> Despite plenty of support from below normal temperatures in the
> key US demand centres the trade appears to have determined that
> the supply side of the ledger is adequate to see us through the
> winter. . . . Although we have seen heavy selling pressure all week
> the Feb/Mar spread has held relatively firm at 6 - 6.5 cpg backward
> still reflecting the current tightness in gulf coast supplies.
> Additionally, values haven't breeched any obvious supports down
> the curve suggesting further weakness is possible. . . .
> []
> Overall, US demand is good but international supply is better ...

55.     On or about February 5, 2004, the members of BP's NGL Trading Bench began to

take steps to avoid losses resulting from their position in February 2004 TET propane and, at

Radley's direction, developed a trading strategy. Specifically, BP's trading strategy for February

2004 TET propane was to control market prices in the February 2004 TET propane market by

establishing a dominant and controlling position in the market. Further, Radley anticipated that

after BP cornered the February 2004 TET propane market, BP could force those who were short

February 2004 TET propane to buy that propane from BP at high prices dictated by BP and

Radley.

56.     On February 5, 2004, the initial planning of BP's manipulative scheme was

captured in a taped conversation. In this recorded conversation, Radley called Abbott to discuss

obtaining management approval for the execution of the February 2004 TET propane trading

strategy. A true and accurate copy of that recording is attached hereto as Exhibit "B". In the

recording Radley describes the benefits of executing the February 2004 TET propane trading

strategy as follows:

> Radley:        Two things I thought of. One, in terms of whether we should do
>                this or not, in terms of talking to Jim [Summers], what we stand to
>                gain, is not just we'd make money out of it, **but we would know**

13

> **from thereafter <u>that we can control the market at will</u>. If we
> never break the threshold,** we'll never know what the answer is,
> you know what I mean?

Abbott:   Yeah, if you go for it, you'll know okay, wait a minute this market
          is way too big and we could never ever do this.

(emphasis added).

Their conversation then continued:

Radley:   The second point is, that I would imagine that **the minimum
          operating level at the end of Feb. is higher than it is at the end
          of March or April** because I think the wholesalers have to hold
          barrels.

Abbott:   have to have something on hand, in order to pump the first day.
          That's right.

Radley:   So I think the minimum level might be a little higher than we're
          assuming based on what we experienced in April. **When we
          squeezed the April May.**

Abbott:   **Right, which was one of the reasons why it was harder to own
          all that April.** That's why we had to take on a little bit more than
          we thought we had to take on, in April. And that's why I think that
          2 mm, 2.1 mm bbls as that min in Feb., I think that's real, man, I
          think that is, **that's the bottom at TET.**

(emphasis added). The remark "When we squeezed the April May," refers to BP's

attempted manipulation of the April 2003 TET propane price through an attempted

corner of the market. The remarks concerning the "minimum operating level" refer to

the minimum level of propane TEPPCO was believed to hold in storage to operate the

TEPPCO system. Radley went on to describe the February 2004 TET propane trading

strategy to Summers. Summers understood and approved BP's February 2004 TET

propane trading strategy.

    57.    According to internal BP documents, BP's February 2004 TET propane trading

strategy developed by the BP traders was described this way:

> In February, 2004 the NGLs trading bench entered into a strategy
> to create a long February – March spread. . . . **The bench planned
> on holding a large portion of existing TET Mont Belvieu
> propane inventory. It was believed that the resulting lack of
> supply at TET would drive up prompt prices, further widening
> the spread. The bench would then liquidate its inventory at
> higher prompt prices before the end of the February.** It was
> expected that only a small portion of inventory would be rolled
> into March resulting in a minimal loss against a substantial gain.

(emphasis supplied). This description of the trading strategy was shared with senior BP

management, including Byers. No one at BP questioned the accuracy of this description of the

BP February 2004 TET propane strategy until after the Commission commenced its investigation

into BP's activities in the February 2004 TET propane market

     58.    A similar description of the strategy exists in a March 2, 2004 email sent from

Summers to Byers, which was a few days after BP cornered the February 2004 TET propane

market, yet failed to generate the anticipated profit from the corner. That email states as follows:

> Cameron,
>
>     As Mark [Radley] said, it is now apparent that once the dust settles we will be
> taking a significant loss on our P&L. Let me expand a bit on what Mark said. The value
> expectation of the trade was based on building a sizeable February position, and then
> **selling a portion of that position at the end of February at a premium,** with the
> remaining unsold BBL's rolling into March at a loss. **Of the 5 million BBL's of length
> we had in February, we expected to sell and/or cash out with the shorts, apx. 2
> million BBL's at a 25 cent gain** (a conservative estimate based on the $1.00+ spread
> that was experienced this time last year), **while rolling the remaining 3 million BBL's
> into March at a 6 cents loss.** At the time we put the trade on, 2 million BBL's seemed
> like a conservative estimate given what we knew (or thought we knew) about the current
> supply/demand picture and the ability of the market shorts to cover. **Assuming we
> could have sold 2 million Feb BBL's, the profit on the trade would have been
> around + $20 million, with potential for upside from there.** While we called the
> upward price movement correctly (the Feb-Mar spread peaked at 34 cents/gal), the
> amount of volume we were able to move was significantly less than we predicted. All-
> in-all, we sold around 700,000 BBL's and rolled 4.6 million BBL's into March.

(emphasis added). Byers received and reviewed this email, but did not reply to this email.

59.     Prior to executing BP's February 2004 TET propane strategy, Radley and Summers met with Marz to obtain approval for the execution of this trading strategy. Marz approved the Trading Bench's February 2004 TET propane trading strategy. Marz cautioned the Trading Bench to refrain from using certain words in conjunction with the February 2004 TET trading strategy, including the word "squeeze."

60.     Radley directed BP employees Abbott, Claborn, Kienenberger and Morby to commence the execution of the February 2004 TET propane strategy on or about February 9, 2004. BP employees followed Radley's directions and began to buy aggressively February 2004 TET propane. Indeed, according to BP's trading records, on February 9, 2004, BP purchased approximately 825,000 barrels of February 2004 TET propane. Each bid, offer, transaction, phone call, e-mail, facsimile, communication or other act by BP employees for February 2004 TET propane pursuant to Radley's directions was an act in furtherance of BP's manipulation of the price of February 2004 TET propane by means of a "corner."

**F.     BP's February 2004 TET Propane Trading Strategy – Execution, February 9 to 13**

61.     At approximately 4:45 p.m. CST, on February 9, 2004, Radley, who was not in the office that day and was on vacation, called Claborn to get an update regarding the execution of the February 2004 TET propane trading strategy. Abbott joined the conversation. A true and accurate copy of the recording of this conversation is attached as Exhibit "C." In the course of this conversation, Radley, Claborn, and Abbott made the following statements:

| | |
|---|---|
| Radley: | What's been going on? |
| Claborn: | How much we got on? I was just looking at that . . . you wanna guess? 3.1 |
| Radley: | Has it been busy today? |
| Claborn: | Oh yeah. Did it very quietly. 10 lots, 5 lots, 10 lots, 15 here, 5 here. The biggest lot I think I bought was 75. |

16

Radley:     Off who?
Claborn:    [Counterparty 1]. Right out of the chute we bought the 150s off
            [Counterparty 2] at 5 7/8, so we dropped that, and then it was just a bunch
            of little ones. Little guys. [Voicebroker 1] did 100 and, probably 150, 175
            smoothly. I mean there were no big lots, like 15 here, 10 here, 10 here,
            15 there. I did two Chalkboard deals all day.
Radley:     Where was the spread at the end of the day?
Claborn:    Uh, I wanna say conservatively probably around 6 1/4.
Abbott:     6 1/2, 6 1/4
Claborn:    Something like that. Dennis is on now. . . .

            ****

Radley:     Did you feel good about it?
Abbott:     I kinda characterize it as . . . I characterize it **as I was kinda surprised we
            were able to get 300 from the marketplace, basically, maybe 3-400
            from the marketplace, without moving it that much. I mean we
            definitely were moving it at the end of the day,** it was definitely firming
            up at the end of the day. And it feels like the market could have been
            anywhere. Like sellers were at 65 cents or 62 cents depending on where
            the market was, right? **So it's kinda, ... it seems like something that will
            just kinda move fairly easily.** There's one more seller out there
            that's [Counterparty 3], I think [Counterparty 3] has one
            chunk they can do, and that's about it.

            ****

Abbott:     I mean tomorrow, tomorrow if we are able to buy another 4-500
            thousand barrels tomorrow from the marketplace, I would be
            genuinely shocked. I mean, really shocked so . . . that's it. Then I
            think . . . we'll just have to play a waiting game and see, you know, how
            it's gonna shape up.
Radley:     (chuckling) It uh, still remains to be seen, doesn't it. **Still need to see
            some of these shorts come in. . . .** Were we the only buyer today?
Claborn:    Pretty much
Abbott:     Pretty much.
Claborn:    There's a few other deals done besides us, but not many at all.
            Just a few. I'd say you could put them all on one hand that wasn't us.
Radley:     What about the surrounding news? What were the draws like over the
            weekend?
Abbott:     We had 150 draw on Friday and then we had the slower draws maybe we
            only drew like 50 over the weekend.
Radley:     [unintelligible].
Abbott:     Yeah, that butane slug. Plus when you look back at the data market the
            draws always slow down on Saturday and Sunday, 'cause the truck
            liftings. The truckers go home and sleep with their women and stuff.

                                    17

| | |
|---|---|
| Radley: | What about the weather outlook? |
| Claborn: | It's still good. |
| Abbott: | Yeah, the weather, is still cold in the Northeast. The parts of the Midwest are now just kinda just normal, normal temps is what they're forecasting, but the Northeast is still cold. Still below and much belows. **The other thing, when you think about it, . . . we're not going to take delivery of this stuff until February 29th, right, 27th, 28th. I mean, the shippers who are going to be required to ship, they're not going to feel, people aren't going to feel concerned until it's time.** |
| Radley: | **Exactly.** |
| Abbott: | I mean this could be the last week. |
| Radley: | **That's absolutely right. There's no doubt about that.** |

    ****

| | |
|---|---|
| Radley: | At the moment, don't forget, that at the moment, even though we're 3.1 million long, we haven't got 3.1 million in physical, yet right? |
| Claborn: | No we got 2.4 million right now, it'll go down to 2.1 after it all priced from this point forward. . . . |
| Abbott: | It could get pretty exciting. If we go off 3 mm long, it will be exciting. |

    ****

| | |
|---|---|
| Radley: | Good. Good. Sounds pretty good. **Well something's got to give. . . . Half of me is saying look, the fact that nothing's really moved in terms of the spread yet is good, because people aren't looking for ways out... or alternative feeds, or backing out demand, so that's kind of a good thing. The down side is of course, if it all happens at the last minute, it gets a bit messy. People start cheating, not delivering, and <u>may start to look a little bit funny as well that the spread, you know, just erupts at the last minute.</u>** |
| Claborn: | And we don't get the price out on all this paper. |
| Abbott: | Well that's a different thing, if we don't get a price out on all this paper, |
| Radley: | **The advantage of paper, is that we're selling at an index price there's no complaints. If we squeeze it in the last four or five days of the month,** ahh, forgive my French, but ah, you know, it's going to be hard to say what's the fair price of the market at the time. |

(emphasis added).

    62.    In the conversation between Radley, Abbott, and Claborn, of which excerpts are set forth above in paragraph 61 of the Complaint, they discuss BP's execution of the February 2004 TET propane strategy. They remark on the fact that:

a.  BP purchased substantial quantities of TET propane that day "very quietly;"

b.  BP's purchase of 300,000 to 400,000 barrels of February 2004 TET propane from the "market" on that day moved the price of February 2004 TET propane;

c.  BP would seek to purchase another 400,000 to 500,000 barrels of February 2004 TET propane from the market and expected that such a purchase would place BP in a position of owning the entire available supply of February 2004 TET propane;

d.  BP would then have to play a "waiting game" with the shorts, waiting for the shorts to come to BP to purchase February 2004 TET propane from BP;

e.  by holding such a large position in TET propane, BP could "squeeze" the price of February TET propane in the last four to five days of the month, making it difficult to determine what constitutes a fair price;

f.  however, by "squeezing" the price, those who are "squeezed" might complain;

g.  it was "good" for BP that the spread between February TET propane and March TET propane had not really moved at this point in time because "people aren't looking for ways out," or seeking "alternative feeds, or backing out demand," i.e., it was good for BP because, they believed, that if the shorts in the market were unconcerned about covering their positions, they would remain short and eventually they would have to purchase February TET propane from BP; and

h.  it would be "bad" for BP if the spread between the price of February 2004 TET propane and the price of March 2004 TET propane widened "at the last minute," because, among other reasons, it would "look a little bit funny" if the "spread, you know, erupts at the last minute."

63.     As captured in that same tape recorded conversation described above, when Radley remarked "excuse my French" he was not, in fact, conversing in the French language. Rather, Radley's remark signifies that he recognized that he used the term "squeeze" on an audiotaped phone line. Accordingly, when Radley returned from vacation, he brought this conversation to the attention of Summers, due to his use of the word "squeeze" in describing the February 2004 TET propane trading strategy.

19

64.     Summers testified under oath that he brought Radley's description of the February 2004 TET propane strategy as a "squeeze" to the attention of Byers and Marz. He further testified that all three individuals - Summers, Byers, and Marz - reviewed the audiotape. Byers testified that Tim Bullock, the president of BP NAGP at that time, also became aware of Radley's description of BP's February 2004 TET propane strategy as a "squeeze."

65.     Beginning on February 9, 2004, BP, by and through its employees and pursuant to directions given by Radley, began purchasing aggressively February 2004 TET propane "any" contracts. Between the morning of February 9, 2004 and the close of business on February 13, 2004, BP purchased over 1.4 million barrels of February 2004 TET propane. BP's position in February 2004 TET propane by the close of business on February 13, 2004 exceeded 3.2 million barrels of propane.

66.     The total TEPPCO system propane inventory fell slightly between February 9, 2004 and February 13, 2004, decreasing from just over 3.2 million barrels on February 9, 2004 to just over 3.1 million barrels on February 13, 2004. Therefore, as early as February 13, 2004, BP's position in February 2004 TET physical propane exceeded the entire TEPPCO system propane inventory. Radley and the Trading Bench knew that BP's position exceeded the entire TEPPCO system propane inventory.

67.     As BP built its long position in February 2004 TET propane, the price of February 2004 TET propane rose steadily between February 9, 2004 and February 13, 2004.

G.      **BP's February 2004 TET Propane Trading Strategy – Execution, February 14th to the 20th**

68.     On February 15, 2004, there was a rupture in the TEPPCO pipeline near Coshocton, Ohio. TEPPCO issued a press release which advised that operations of all terminals, including propane terminals, east of Todhunter, Ohio, with the exception of Eagle, Pennsylvania,

20

would be suspended until the pipeline could be repaired. Since the TEPPCO pipeline is unidirectional, the pipeline rupture had the effect of increasing the amount of TET propane available at the TEPPCO storage facility and reducing the amount of propane that could be delivered from the pipeline. By February 16, 2004, the total TEPPCO system inventory increased to just over 3.3 million barrels.

69.     In testimony, Summers acknowledged that even though at the time the pipeline ruptured BP's position in February 2004 TET propane was much greater than the demand initially anticipated by the Trading Bench, the increased supply resulting from the pipeline rupture compelled BP, pursuant to Radley's strategy, to increase its already substantial position. He stated that if:

> [BP] hadn't purchased that volume, then the short positions would be buying that volume from the marketplace, so we wouldn't be in a position to meet that demand…If we had chosen not to buy it or in fact sell our position, **then the shorts could have covered a large portion of their positions at that time.**

(emphasis added). Because BP's February 2004 TET propane strategy was to corner the shorts, i.e., force them to buy February 2004 TET propane only from BP at high prices dictated by BP, BP had to purchase the additional supply of TET propane that resulted from the pipeline rupture to ensure that the shorts could not obtain TET propane "from the marketplace."

70.     In addition to the increased supply of TET propane as a result of the TEPPCO pipeline rupture on February 15, 2004, weather forecasts around that time period indicated warmer weather in the Northeast United States. In fact, there was a strong warming trend in the Northeast United States in the last two weeks of February 2004. This had the effect of reducing demand for TET propane from the residential/commercial sector.

21

71.     During this same time period, there continued to be forecasts of substantial imports of propane being delivered into the Gulf Coast and East Coast of the United States. For example, on February 17, 2004, BP received a published report from Commercial Services Company, Ltd. which forecast approximately 4.2 million barrels of propane destined for the United States in February 2004. This report also forecast that an additional 1.1 million barrels of propane would be imported into the United States in March 2004. This represented a significant increase in the amount of propane being imported into the United States for comparable time periods.

72.     On February 16, 2004, in a taped conversation, Claborn made the following statement describing the manner in which BP was to accumulate its dominant long position: " . . . he talked to Cameron, told him what we were doing, Cameron said just don't try to bring any extra attention. . . ." The only person with supervisory authority over the NGL Trading Bench that went by the name of "Cameron" at the time was Byers.

73.     BP continued its aggressive purchasing campaign of February 2004 TET propane between February 17, 2004 and February 20, 2004. During that week, BP - by and through its employees and consistent with directions given to them by Radley - purchased at least an additional 1.4 million "any" barrels of February 2004 TET propane. BP's position in February 2004 TET propane increased to just under 4.7 million barrels by the close of business on February 20, 2004. As of that date - February 20, 2004 - Byers, Marz, Summers, Radley and other members of the Trading Bench knew that BP's position exceeded the entire TEPPCO system propane inventory.

22

74.    As BP and Radley continued to build BP's position in February 2004 TET propane, the price of February 2004 TET propane increased throughout that week, although it dropped initially as a result of the pipeline rupture and weather forecasts.

75.    The total TEPPCO system propane inventory steadily increased between February 17, 2004 and February 20, 2004. The total TEPPCO system propane inventory on February 17, 2004 was just over 3.4 million barrels, and increased to just over 3.6 million barrels on February 20, 2004. Throughout this week, BP's position in February 2004 TET propane exceeded the entire TEPPCO system propane inventory, sometimes by as much as 1 million barrels. Some TET market participants recognized BP's trading behavior. For example, in a taped conversation between Abbott and another market participant on February 18, 2004, the following exchange occurred:

**participant:**    Jeez what is y'all's appetite for propane? I mean, it's just like feeding an elephant. You guys aren't really short though, are you? You just got stuff pricing out? You're short pricing or what?

**Abbott:**    Um, yeah, we just like it.

**participant:**    You dig it, huh?

**Abbott:**    I'd call, … I'd call it insatiable right now.

In another taped conversation between Claborn and another market participant, the following conversation took place on February 19, 2004:

**participant:**    Cody Hunt?

**Claborn:**    huh?

**participant:**    Cody Hunt? Is that who this is?

*///*

**Claborn:**    What are you talking about, man?

23

**participant:**   Someone told me you that guys were trying to corner the TET market so I figured you were one of the Hunt Brothers.

**Claborn:**   I think you are badly mistaken. Who told you that?

**participant:**   Huh? Oh man, that's all over the place. Come on, you've heard that....

76.   On February 19, 2004, at approximately 9:30 a.m., Byers, Marz, Summers and Radley met in Byers's office to discuss the Trading Bench's activities with respect to February 2004 TET propane. In that meeting, Radley informed Marz and Byers that BP's position in February 2004 TET propane "exceeded the availability of barrels in the marketplace at that time." Marz acknowledges that during that meeting they discussed the fact that BP's TET position on that date was around 5.1 million barrels and that the total available supply in TET storage was around 3 million barrels. In the course of that meeting, Byers took handwritten notes regarding BP's February 2004 TET propane trading strategy. Those notes read:

- Bulk Mt. Belvue [*sic*]
- People reducing inventory
- Unregulated – OTC + Chalkboard
- 25 – 35 shorts to us
- Heavily backwardated

Radley informed Byers and Marz that the Trading Bench could unwind the large position it had built in February 2004 TET propane if that was Byers's and Marz's decision. Following the February 19, 2004 meeting the Trading Bench did **not** unwind BP's February 2004 TET position. Rather, the Trading Bench actually increased BP's position in February 2004 TET propane after February 19, 2004.

77.   During the course of the February 19, 2004 meeting, Byers, Marz, Summers and Radley also discussed the fact that the Trading Bench had exceeded a position limit imposed by BP policy. Specifically, the position limit was a calendar spread position limit. Pursuant to BP policy, the Trading Bench was required to obtain Byers' approval if the calendar spread position

24

limit was to be exceeded. Following the February 19, 2004 meeting, the Trading Bench continued to exceed their calendar spread position limit.

78.     Following the February 19, 2004 meeting, Marz met with Radley to discuss BP's February 2004 TET propane trading strategy on several occasions.

79.     On February 19, 2004, Gasteam USA, a voicebroker, sent out its Daily Gasteam Report to, among other recipients, BP employees. That report included the following statement in the section identified as "NGL COMMENT":

> WITH SOME LARGE PLAYERS CONTINUING TO BUY
> FRONT – MONTH TET PROPANE IN THE HOPES OF
> PUTTING ON A SQUEEZE, FEBRUARY LEAPT FROM 68.25
> C.P.G. TO 70.00 C.P.G. ON VERY SMALL VOLUMES.

This was one of the first of a number of published statements in industry newsletters regarding allegations of market manipulation of TET propane during February 2004 which were received by BP employees.

## H.  BP's February 2004 TET Propane Trading Strategy – Execution, February 21st to 29th

80.     Over the weekend of February 20 through February 22, 2004, the TEPPCO system propane inventory continued to increase, adding as much as 450,000 barrels of propane. Despite this increased supply, BP's position in TET propane continued to exceed the TEPPCO system propane inventory.

81.     On February 23, 2004, BP - by and through its employees and pursuant to directions given to them by Radley - increased its long position in February 2004 TET propane. On that date, BP purchased February 2004 TET "any" propane at prices between 73.5 cpg and 75.125 cpg, and sold February 2004 TET "any" propane at the OPIS average price for the

25

remainder of the month of February which was calculated by using each subsequent day's OPIS average price. These trades indicate that Radley believed that the OPIS average price for the remainder of the month would exceed the approximate 75 cpg that they were paying for the February 2004 TET "any" propane.

82.     The OPIS average price for February 2004 TET propane on February 23, 2004 increased to 74.6875 cpg, an increase of 3.5625 cpg over the OPIS average for February 2004 TET propane on February 20, 2004. Some TET propane market participants suspected BP was affecting the price of February TET propane. For example, in an instant message between two market participants, the following conversation occurred:

| | |
|---|---|
| **participant A:** | is this just an amazing short squeeze for feb TET?  last kick at the TET cat combined with shorts.......or is something else miraculous going on? |
| **participant B:** | it's bp – trying to squeeze – but the weather is not cooperating – not going to be like last year – and they have a huge position in a market that is .16-.17 backward |
| **participant B:** | tet inventories built almost 500mb from firday [sic] thry [sic] sunday |
| **participant A:** | very nice! thnx |
| **participant B:** | you doing well? |
| **participant A:** | then the rascals use the hi TET numbers to try supporting pricing increases in Michigan and other places! |
| **participant B:** | exactly |
| **participant A:** | tell you what ...........if they push it up over here, Exxon and Kinetic will jettison (even more) their own product and BP will have lots of product to get next year's prebuy programs off to a start |
| **participant A:** | a high priced start ...........they'll have to pull out the old "you should pay a premo price because of BP's exceptional service and reliability" cards. |

26

83.    The total TEPPCO system propane inventory increased during the week of February 21, 2004 to February 29, 2004 by approximately one million barrels. Nonetheless, BP's position in February 2004 TET propane continued to exceed the entire TEPPCO system propane inventory during that entire week. Radley knew that BP's position exceeded the entire TEPPCO system propane inventory.

84.    In or about the morning of February 24, 2004, BP - by and through its employees who acted pursuant to directions given to them by Radley - continued to purchase aggressively February 2004 TET propane, buying more than 250,000 barrels at prices between 74.25 cpg and 78.25 cpg.

85.    Due to the fact that BP was holding such a dominant and controlling position in February 2004 TET propane, there were few other market participants that could offer February 2004 TET propane to market participants in significant quantities. For example, on February 24, 2004, between 12:33 p.m. and 4:35 p.m., there were no offers - other than those offers made by BP - to sell February 2004 TET propane in volumes greater than 10,000 barrels on Chalkboard.

86.    On February 24, 2004, after 11:00 a.m., BP employees, acting pursuant to directions given to them by Radley, sold over 500,000 barrels of February 2004 TET propane at steadily increasing prices between 79 cpg and 88.25 cpg. BP employees, acting pursuant to directions given to them by Radley, caused the price of February 2004 TET propane to increase on February 24, 2004. Radley intended to affect the price of February 2004 TET propane.

87.    The OPIS average price for February 2004 TET propane on February 24, 2004 increased to 81.125 cpg, an increase of 6.4375 cpg over the same OPIS average price on February 23, 2004. The TEPPCO system propane inventory also increased on February 24,

2004. On February 24, 2004, BP's position in February 2004 TET propane exceeded the amount

of propane in the TEPPCO system propane inventory. Radley knew that BP's position exceeded

the entire TEPPCO system propane inventory.

88.    On February 24, 2004, BP employees executed an internal transaction "re-

designating" three million barrels of February 2004 TET propane as March 2004 TET propane

"wet" barrels. Abbott executed this internal transaction at the direction of management, noting:

> Rolling feb[ruary] length to WET March market. we will be carrying bbls [barrels] over
> to march [*sic*]

At the time, three million barrels of TET propane represented approximately 75% of the entire

TEPPCO system propane inventory. Prior to this transaction, the NGL Bench had never

executed an intra-month roll-over of one month's NGL barrels into a subsequent month.

89.    On February 24, 2004, Gasteam USA sent out its Daily Gasteam Report to,

among other recipients, BP employees. That report included the following statement in the

section identified as "NGL COMMENT":

> GAS LIQUIDS PRICES HAD A SLOW START, BEFORE,
> ONCE AGAIN, LEAPING HIGHER ON AGGRESSIVE
> BUYERS WHILE THE MERC SCREEN SHOWED ONLY A
> MODEST CHANGE IN ITS STANCE. THE MONT BELVIEU
> MARKET CONTINUES TO TAKE ITS PRICING DIRECTION
> FROM A FEW PLAYERS THAT ARE SQUEEZING THE
> SHORTS IN THE PROPANE MARKET.

90.    Similarly, OPIS published a newsletter on February 24, 2004 which was sent to,

among others, BP employees. That newsletter contained the following statements:

> IN SPOT TRADING . . .
> The talk in the propane markets is that one or more firms may be
> involved in a short squeeze in the TET propane market. Traders
> speculate that those firms own a hefty proportion of the inventories

28

in TET storage and they are making sellers pay up for the right to
cover.
"Somebody got to be getting killed," said one trader. "I hope it's
nobody that owes me money."
Traders marveled at the fact that TET propane opened at 74cts/gal
and ended the session at 88.25cts/gal. But, as traders said, none of
the other propane markets seem to be touched by the rally. March
TET barrels, in contrast, showed a 59-59.75cts/gal range of deals.
Non-TET anys were done from 68-73.5cts/gal, with March barrels
sold from 58.5-59.25cts/gal.

91.     On February 25, 2004, BP employees, acting pursuant to directions given to them

by Radley, purchased aggressively February 2004 TET propane, as new sellers of February 2004

TET propane entered the market seeking to take advantage of the higher prices BP and Radley

caused through BP's trading activities.  On February 25, 2004, BP employees, acting pursuant to

directions given to them by Radley, purchased more than 600,000 barrels of February 2004 TET

propane at prices between 85.25 cpg and 91.25 cpg.  The OPIS average price for February 2004

TET propane increased to 89.25 cpg on February 25, an increase of 8.125 cpg over the same

OPIS average price on February 24, 2004.

92.     BP's position in February 2004 TET propane increased to just over 4.9 million

barrels on February 25, 2004.  The total TEPPCO system propane inventory on February 25,

2004 increased to just over 4.1 million barrels.  Radley knew that BP's position exceeded the

entire TEPPCO system propane inventory.

93.     On February 26, 2004, BP employees, acting pursuant to directions given to them

by Radley, continued purchasing aggressively February 2004 TET propane.  Despite the fact that

BP held an enormous position in February 2004 TET propane, on February 26, 2004, BP

employees, acting pursuant to directions given to them by Radley, **refused to sell** any February

2004 TET propane to the market.  In fact, BP employees, acting pursuant to directions given to

them by Radley, made no offers to sell February 2004 TET propane on February 26, 2004.

94.    Instead, on February 26, 2004, BP employees, acting pursuant to directions given

to them by Radley, continued to purchase February 2004 TET propane, buying over 250,000

more barrels of February 2004 TET propane at prices between 79.5 cpg and 84 cpg. The OPIS

average price for February 2004 TET propane decreased to 80.875 cpg on February 26, 2004, a

decrease of 8.375 cpg lower than the same OPIS average price on February 25, 2004.

95.    On February 26, 2004, BP employees, acting pursuant to directions given to them

by Radley, executed a second internal transaction "re-designating" 800,000 bbls of February

2004 TET propane as March 2004 "wet" barrels. Employee Kienenberger executed this internal

transaction at the direction of management.

96.    On February 26, 2004, the total TEPPCO system inventory increased to just over

4.3 million barrels of propane, while BP's position in February 2004 TET propane increased to

over 5.1 million barrels.

97.    Early Friday, February 27, 2004, BP employees, acting pursuant to directions

given to them by Radley, continued their aggressive purchasing of February 2004 TET propane,

buying almost 50,000 bbls before 9:00 a.m.

98.    By 10:00 a.m., February 27, 2004, BP was the primary seller of February 2004

TET propane for any significant volume and BP employees, including Claborn, at the direction

of Radley began dictating the price of February 2004 TET propane to shorts who sought to

purchase February 2004 TET propane. For example, in a taped conversation between Claborn

and a voicebroker, the following statements were made:

> **Voicebroker:** Hey. Where's your next one?
> **Claborn:**    Confirm, [Company A] buys 25,000 physical TET Feb. at
>                 .8850
> **Voicebroker:** Correct. . . .
> **Claborn:**    Next one is .89, . . . .89.
> **Voicebroker:** .89?

30

| Claborn: | Yep. |
|---|---|
| Voicebroker: | [Talking on other line]....89. [To Claborn] Just one second. [On other line] You got one shot at it. [To Claborn] I'm telling people they got one shot. |
| Claborn: | That's it. |
| Voicebroker: | How's your day going, man? You're done by the way with [Company B]. |
| Claborn: | [Company B] buys 25,000 at .89 |
| Voicebroker: | 89. Where's your next? 89 and a half? |
| Claborn: | 89 and a half. |
| Voicebroker: | Alright. [On other line] .89 and a half, next [to Claborn]... Are you just walking them up a half step? |
| Claborn: | Now |
| Voicebroker: | For now, you are .... |
| Claborn: | ...yes. |
| Voicebroker: | [on other line]...89 and a half is next, his next offer comes in a penny higher. |

This recorded conversation demonstrates that BP did not negotiate on the price of February 2004 TET propane, rather, through the voicebroker, it dictated the price to the buyer who needed to cover its short position. Claborn acted pursuant to directions given to him by Radley. A true and correct copy of the full recording is attached hereto as Exhibit "D."

99.    By at least February 27, 2004, BP cornered the February 2004 TET propane market by establishing a dominant long position and dictating to the shorts the prices they had to pay to offset their position. During the month of February 2004, BP and Radley purchased February 2004 TET propane with the purpose of intentionally acquiring control or market dominance over the February 2004 TET propane market, and with the intent to dictate - to those who were short February 2004 TET propane - prices that would not otherwise have been reached under the normal pressures of supply and demand. By at least February 27, 2004, the price of February 2004 TET propane was artificial. BP employees, acting pursuant to directions given to them by Radley, caused the market price of February 2004 TET propane to increase, with certain

31

prices reaching as high as 94 cpg. The price of February 2004 TET propane also affected the price of the NYMEX March propane futures contract.

100.    As a result of the execution of the February 2004 TET propane trading strategy, BP owned, at the end of February 2004, over 88% of all propane in the TEPPCO system.

101.    The total TEPPCO system propane inventory at the end of February 2004 exceeded the five year average system propane inventory by approximately 65%.

102.    On February 26, 2004, Butane-Propane News, Inc. published its Weekly Propane Newsletter dated March 1, 2004, Volume 34, Number 9. The lead story in that newsletter was titled "TEPPCO Propane Trading at Significant Premium." The first two paragraphs reported:

> Last week saw a large jump in pricing for TEPPCO propane spots at Mont Belvieu, and even though the market made a sharp correction as the week progressed, it remains about a dime over non-TEPPCO propane. Traders tell the *NEWSLETTER* that a number of players got caught short and had to step in to cover their positions as trading for February wound down.
>
> Although this spike in prices was fairly well limited to the TEPPCO market, it did impact propane postings along the TEPPCO system, which spiked as much as 19 cents and peaked over 100.00 cents/gal. for some wholesalers at various terminals.

(emphasis in original). "Propane postings" refer to prices charged for propane sold to wholesalers at various locations.

103.    Byers, Marz and Summers were each aware of the February 2004 TET propane strategy prior to February 27, 2004. Specifically, each was aware that BP's February 2004 TET propane strategy sought to corner the February TET propane market. Byers, Marz and Summers met to discuss the strategy at least as early as February 19, 2004. Byers, Marz, and Summers learned at that meeting that BP's position in February 2004 TET propane exceeded the amount

of propane in the entire TEPPCO system. Byers, Marz and Summers each were aware that Radley had characterized the BP's February 2004 TET propane strategy as a "squeeze." Summers, Marz, and Byers approved the BP February 2004 TET propane strategy. Summers allowed Radley to execute the February 2004 TET propane strategy. Marz allowed Radley to execute the February 2004 TET propane strategy. Byers allowed Radley to execute the February 2004 TET propane strategy. Neither Radley, nor anyone else on the Trading Bench, ever received instructions or guidance from BP management to refrain from cornering the February 2004 TET propane market and executing BP's February 2004 TET propane trading strategy.

## I.    BP's Subsequent Actions

104.    On March 1, 2004, the price of TET propane fell precipitously. The OPIS average price on Monday, March 1, 2004 was 61.75 cpg, falling almost 25 cpg from the OPIS average published price on February 27, 2004. The price for March 2004 TET propane continued to fall for the remainder of that week. By March 10, 2004, the price of March 2004 TET propane fell to 56.125 cpg.

105.    Certain counterparties failed to deliver TET propane to BP in satisfaction of their obligations. BP employees, pursuant to directions given to them by Radley, refused to accept late delivery, and instead dictated that each counterparty that failed to deliver TET propane pay 94 cpg to satisfy the obligation. BP employees, pursuant to directions given to them by Radley, refused to negotiate on this price.

106.    While BP employees, acting pursuant to directions given to them by Radley, were successful in manipulating the price of February 2004 TET propane and cornering the February 2004 TET market, they failed to make the anticipated profit because the costs associated with

33

acquiring the dominant and controlling position in February TET propane were greater than the profits they extracted from the shorts whom they cornered.

107.    In response to the unprofitable trading strategy, BP management began a non-privileged business review of the February 2004 TET propane trading strategy.

108.    One of the objectives of the business review was to determine how the strategy could be made profitable in the future. One aspect of BP's non-privileged business review of the February 2004 TET propane trading strategy involved a "peer review" of the trading strategy and development of a list of "lessons learned" from the trading strategy. Radley, at the direction of Summers and Byers, developed a powerpoint presentation and a list of items which, in Radley's words, would provide direction to other BP traders **"if there's any applicable opportunities in some of the other markets . . . ."**

109.    Prior to the formal peer review meeting which occurred on March 26, 2004, Radley sent an article from OPIS which described certain market conditions during February 2004 to, among others, Summers, who forwarded the article to Byers and Marz. The article, published on March 17, 2004, was titled "FEBRUARY PROPANE RALLY PAINFUL FOR SOME" and the article began with the statement "When TET propane prices broke from the rest of the U.S. market and rallied sharply in late February, few traders were shy about pointing fingers at companies and uttering the words 'short squeeze.'"

110.    Among the powerpoint slides used in the peer review was a slide entitled "2004 Position Summary v. TEPPCO Inventory v. C3 Price." A copy of that slide is reproduced as Exhibit "E," attached to this Complaint. Summers and Marz, among other BP employees attended the peer review.

34

111.   Thus, according to this slide, marked as Exhibit "E", BP's position in February 2004 TET propane exceeded all TEPPCO system propane inventory early in the month, and the most dramatic price increases in February 2004 TET propane occurred when BP's position was at its largest.  This slide was reproduced in powerpoint presentations given to senior BP management both in the United States, including Summers, Byers and Marz, as well as BP management in the United Kingdom, including John Mogford and Tony Fountain.  A copy of a draft powerpoint presentation (including this slide) entitled "Feb Lessons Learned.ppt" which was sent to Byers is attached as Exhibit "F."

112.   Despite this information, as well as other information, including the information relayed in the February 19, 2004 meeting, the published article regarding a "short squeeze" in the February 2004 TET propane market, and knowledge of Radley's taped description of the February 2004 TET propane trading strategy as a "squeeze", neither Summers, Byers, nor Marz rebuked, censured or otherwise disciplined any employee on the Trading Bench for the February 2004 TET propane trading strategy until after the Commission began its investigation.  In fact, Summers and Byers authorized bonuses for Radley and other members of the Trading Bench for their 2004 trading activities.

J.     **BP's April 2003 TET Propane Trading Strategy**

113.   In April 2003, BP employees, pursuant to directions given to them by Radley, engaged in a trading strategy similar to the BP February 2004 TET propane trading strategy.  BP employees, pursuant to directions given to them by Radley, built a long position in April 2003 TET propane for the purpose of attempting to corner the April 2003 TET propane market, and to also affect the price of April 2003 TET propane.  Each bid and offer made by BP employees for April 2003 TET propane pursuant to Radley's directions was an act in furtherance of BP's

attempted manipulation of the price for April 2003 TET propane. Radley intended to corner the

April 2003 TET propane market and thereby intended to affect the price of April 2003 TET

propane.

114.    Going into the month of April 2003, BP had established a significant long

position in April 2003 TET propane. On April 2, 2003, in a taped conversation, Abbott called

Claborn. Radley joined the conversation, and the following statements were made:

> **Abbott:**  How does it feel taking on the whole market, man?
> **Claborn:**  Whew. It's pretty big man.
> **Abbott:**  Dude, you're the entire [expletive deleted] propane market.
>
> /// 
>
> **Radley:**  **Don't worry about it, it's the first two days of the month. Plenty of lead time for people to think that barrels will emerge and take a short position.**
>
> ///
>
> **Abbott:**  No, I mean, it's cool, 100% of the open interest in propane probably, and, uh 3% of the open interest in nat gas. . . . I dig it, it just, sometimes its hard, it just feels hard to take on the whole market sometimes . . . .
>
> ///
>
> **Radley:**  Here's my one fear, and its a significant fear. Everybody waits until the last [expletive deleted] day to cover, and then we get wound up in a [expletive deleted] bunch of legal disputes. That's my fear.
> **Abbott:**  Yeah.
> **Radley:**  That's my fear. People don't cover, don't cover, then the last day they either default or come to us to get them out of it and then we have to try and basically set a price that seems fair . . . .

A true and correct copy of this tape is attached hereto as Exhibit "G."

115.    Despite their statements that they were "the entire propane market" and "100% of

the open interest in propane" on April 2, 2003, BP employees, acting pursuant to Radley's

instructions, continued to purchase April 2003 TET propane in significant quantities throughout the month of April 2003. BP employees, acting pursuant to Radley's instructions, continued to purchase April 2003 TET propane throughout the month in an effort to corner the April 2003 TET propane market. Radley anticipated that after BP cornered the April 2003 TET propane market, BP could force those who were short April 2003 TET propane to buy April 2003 TET propane from BP at high prices dictated by BP.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT 1:  MANIPULATION OF THE PRICE OF TET PROPANE IN FEBRUARY 2004

116.    Paragraphs 1 through 115 are realleged and incorporated herein by reference.

117.    Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it unlawful for any person to manipulate the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

118.    Radley and other BP employees intended to affect the price of February 2004 TET propane. Radley, in conjunction with other BP employees, possessed the ability to cause and did cause the price of February 2004 TET propane to be artificial on at least February 27, 2004. Accordingly, Radley violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2002).

119.    Each and every overt action in furtherance of the intent to affect the price of February 2004 TET propane, coupled with that intent, including but not limited to every purchase, sale, bid, offer, telephone call, e-mail and instant message, is alleged herein as a separate and distinct violation of Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

37

120.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Radley and others were employees or agents of BP and their actions that violated Sections 6(c), 6(d), and 9(a)(2) of the Act were within the scope of their employment, BP is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

### COUNT 2: CORNERING THE MARKET IN TET PROPANE IN FEBRUARY 2004

121.    Paragraphs 1 through 115 are realleged and incorporated herein by reference.

122.    Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), makes it unlawful for any person to corner any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

123.    Radley and other BP employees intended to corner the February 2004 TET propane market. Radley, in conjunction with other BP employees, cornered the February 2004 TET propane market by formulating and executing BP's February 2004 TET propane strategy. Accordingly, Radley violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2002).

124.    Each and every day Radley cornered the February 2004 TET propane market is alleged herein as a separate and distinct violation of Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2) (2002).

125.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Radley and others were  employees or agents of BP and their actions that violated Section 9(a)(2) of the Act were

38

within the scope of their employment, BP is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

### COUNT 3: ATTEMPTING TO MANIPULATE THE PRICE OF TET PROPANE IN FEBRUARY 2004

126.    Paragraphs 1 through 115 are realleged and incorporated herein by reference.

127.    Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it illegal for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

128.    Radley, Abbott, Claborn, Summers, Marz, and Byers intended to affect the price of February 2004 TET propane. Radley, Abbott, Claborn, Summers, Marz, and Byers engaged in overt actions in furtherance of their intent to affect the price of February 2004 TET propane.

129.    Each and every overt action in furtherance of the intent to affect the price of February 2004 TET propane, coupled with that intent, including but not limited to every purchase, sale, bid, offer, telephone call, e-mail and instant message, is alleged herein as a separate and distinct violation of Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

130.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Radley, Abbott, Claborn, Summers, Marz, and Byers were employees or agents of BP and their actions that violated Sections 6(c), 6(d), and 9(a)(2) of the Act were within the scope of their employment, BP is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

## COUNT 4: ATTEMPTING TO MANIPULATE THE PRICE OF TET PROPANE IN APRIL 2003

131.    Paragraphs 1 through 115 are realleged and incorporated herein by reference.

132.    Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it illegal for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

133.    Radley and other BP employees intended to affect the price of April 2003 TET propane. Radley caused members of the Trading Bench to engage in overt actions in furtherance of their intent to affect the price of April 2003 TET propane.

134.    Each and every overt action in furtherance of Radley's intent to affect the price of April 2003 TET propane, including but not limited to every purchase, sale, bid, offer, telephone call, e-mail and instant message, coupled with that intent, is alleged herein as a separate and distinct violation of Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

135.    Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Radley and others were employees or agents of BP and their actions that violated Sections 9(c), 6(d), and 9(a)(2) of the Act were within the scope of their employment, BP is liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find Defendant liable for violating Sections 6(c) and 6(d) and 9(a)(2) of the Act,
7 U.S.C. §§ 9, 13b, and 13(a)(2) (2002);

B.    Enter an order of permanent injunction restraining and enjoining Defendant and
any of its affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in
active concert with them who receive actual notice of such order by personal service or
otherwise, from directly or indirectly violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7
U.S.C. §§ 9, 13b and 13(a)(2) (2002);

C.    Enter an order directing Defendant to pay civil monetary penalties, to be assessed
by the Court, in an amount not to exceed $120,000 or triple the monetary gain to it for each
violation of the Act, as described herein; and,

D.    Enter an order providing for such other and further remedial and ancillary relief,
including, but not limited to restitution, disgorgement and damages to all persons affected by
Defendant's actions, as this Court may deem necessary and appropriate; and,

E.    Enter an order requiring Defendant to pay costs and fees as permitted by 28
U.S.C. §§ 1920 and 2412(a)(2).

Dated: June 28, 2006

Respectfully Submitted,

Gregory Mocek
Director, Division of Enforcement

Joan Manley
ATTORNEY FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

Deputy Director, Division of Enforcement
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5356
(202) 418-5519 (facsimile)

Joseph Konizeski
Senior Trial Attorney, Division of
Enforcement
Paul Hayeck, Associate Director, Division of Enforcement
Judy Lee, Trial Attorney, Division of Enforcement
Christine Ryall, Senior Trial Attorney, Division of
    Enforcement
ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street N.W.
Washington, D.C. 20581
(202) 418-5334
(202) 418-5523 (facsimile)


ATTORNEY FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION
525 West Monroe Street
Suite 1100
Chicago, Illinois 60661
(312) 596-0714 facsimile

Susan J. Gradman
Senior Trial Attorney
Illinois ARDC No. 6225060
(312) 596-0523
sgradman@cftc.gov

42

ATTACHMENT 1

**GLOSSARY**

Dennis Abbott ("**Abbott**") was the "second-in-command" on BP's NGL Trading Bench in February 2004.

"**Any**" or "**Any barrel.**" A contract for an "**any**" barrel of propane for a particular month may be delivered at any time, with agreement of the buyer and the seller, during the month up to the last calendar day.

**BP Products North America ("BPNA" or "BP")** is a wholly owned subsidiary of BP p.l.c., the second largest energy company in the world. In 2004, BP was one of the largest Natural Gas Liquids ("NGLs") marketers and producers in the United States. BP also consumes propane in connection with its chemical manufacturing business.

**BP North American Gas and Power ("NAGP")** is the trading arm of BP in North America and the "face to the market" for trading NGLs, and specifically TET propane.

**BP Natural Gas Liquids Business Unit ("NGLBU")** handles the production, wholesale marketing and transportation of NGLs in North America, including propane.

**Donald Cameron Byers ("Byers")** is currently the CEO and President of NAGP and, in February 2004, was the Chief Operating Officer of NAGP.

"**Chalkboard**" is an electronic bulletin board that provides a means for propane traders to engage in bilateral negotiations. Chalkboard allows parties to post bids and offers and negotiate transactions in propane but Chalkboard does not take title to propane.

Cody Claborn ("**Claborn**") was the primary trader for TET propane in February 2004 and participated in the execution of BP's February 2004 TET propane strategy. Claborn was placed on paid administrative leave during the Division's investigation in this matter, and was recently fired for his actions in connection with BP's February 2004 TET propane trading strategy.

Dynegy Liquids Marketing (**"Dynegy"**) owned and operated a propane storage facility also located in Mont Belvieu Texas during the relevant period. Propane stored at that facility and deliverable to that location is referred to as "non-TET" propane by the propane industry.

Enterprise Products Partners, LP ("**Enterprise**") owns and operates a natural gas liquids storage facility also located in Mont Belvieu Texas. Propane stored at that facility and deliverable to that location is referred to as "non-TET" propane by the propane industry.

Martin Marz ("**Marz**") was the Compliance Manager for NAGP in February 2004. He has recently been removed from that position and is currently a Regulatory Affairs Consultant for BPNA with no responsibility for supervising trading on behalf of BP.

Mark Radley ("**Radley**") was the Bench Leader for the NGL Trading Bench for NAGP from approximately December 2002 through April 2005. Radley was placed on paid administrative leave during the Division's investigation in this matter, and was recently fired by BP for his actions in connection with BP's February 2004 TET propane trading strategy.

"**NGL**" is an acronym for natural gas liquids.

"**NGL Bench**" refers to BPNA's group of traders that trade natural gas liquids.

Oil Price Information Service ("**OPIS**"), is a private price reporting service, which conducts daily surveys of traders and provides a daily midpoint, or "OPIS Average," for the propane commodity market based on the simple average of the highest and lowest observed prices.[1] The OPIS Average is also used in the propane markets to settle financial swaps and options. The OPIS publishes prices for spot and forward months in both TET and non-TET propane, as well as for Conway, Kansas propane. It also publishes prices for each of these propane products in outlying quarters.

"**Physical propane**" or "**Physical propane contract**" refers to a contract that provides the purchase or sale of actual propane. Physical propane is traded either as "wet" barrels or as "any" barrels for purposes of delivery. Physical propane is traded in the cash markets using largely standardized contracts traded in volumes denominated in barrels of liquified propane ("bbls"). Each barrel holds 42 gallons of propane. Propane prices are quoted in cents per gallon ("cpg") at increments of $1/8^{th}$ of a cent. Physical propane may be traded either at a "fixed" price or an "index" price. The index is published on a daily basis by OPIS. The delivery location of the propane is a function of the propane product being traded, *i.e.*, the delivery location for TET propane is the TEPPCO storage facility, and the delivery location for non-TET propane is either Dynegy or Enterprise.

"**Propane.**" Propane is one of the five primary natural gas liquids (NGLs). Propane is a by-product created during the processing and separating of natural gas liquids from natural gas to meet pipeline standards, or during the crude oil refining process.

James Summers ("**Summers**") was the Vice President of NGL Trading for NAGP in February 2004.

"**TET**" is an acronym for Texas Eastern Transmission Corporation. The phrase "TET propane" refers to propane that is deliverable at the TEPPCO storage facility in Mont Belvieu, Texas or any where within the TEPPCO system.

"**TEPPCO**" is an acronym for Texas Eastern Products Pipeline Co, LLC. The TEPPCO storage facility is located in Mont Belvieu Texas. The TEPPCO storage facility is also the delivery location for the New York Mercantile Exchange's ("NYMEX") propane contract. TEPPCO is the largest single storage facility for physical propane in the world is owned and operated by

---

[1]  The "OPIS Average" is not weighted according to volume.

TEPPCO Partners, L.P. in Mont Belvieu, Texas ("TEPPCO storage facility"). The TEPPCO storage facility is the primary source for propane used in residential, commercial and agricultural heating in the northeastern United States via the TEPPCO pipeline, which runs from Mont Belvieu, Texas north through Ohio, into New York, Pennsylvania and Illinois.

"**Voicebrokers**" are individuals that broker transactions between propane traders through telephonic as well as instant messaging and email.

"**Wet**" or "**wet barrel**" refers to a physical barrel of propane that has a specific delivery date within a particular month.

iii

**EXHIBIT 3**

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CRAIG RIDGWAY, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-06-765-M |
| BP PRODUCTS NORTH AMERICA, INC., | ) ) ) | |
| Defendant. | ) ) | |

## ORDER

Before the Court is the parties' "Stipulation to Transfer Action to the United States District Court for the Northern District of Illinois" [docket no. 13], filed October 24, 2006. The parties advise the Court that they agree to transfer this action to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). Having considered the parties' stipulation to transfer, the Court hereby TRANSFERS this action to the United States District Court for the Northern District of Illinois.

**IT IS SO ORDERED this 3rd day of November, 2006.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANITA WHITE, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CIV-06-861-M |
| BP PRODUCTS NORTH AMERICA, INC., | ) ) | |
| Defendant. | ) ) | |

### ORDER

Before the Court is the parties' "Stipulation to Transfer Action to the United States District Court for the Northern District of Illinois" [docket no. 13], filed October 24, 2006. The parties advise the Court that they agree to transfer this action to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). Having considered the parties' stipulation to transfer, the Court hereby TRANSFERS this action to the United States District Court for the Northern District of Illinois.

**IT IS SO ORDERED this 3rd day of November, 2006.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE

**EXHIBIT 4**

LEVIN

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.0 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:06-cv-03541

Dennison et al v. BP Products North America, Inc. et al
Assigned to: Honorable James B. Zagel
Member case: (View Member Case)
related Cases: 1:06-cv-04188
  1:06-cv-03570
  1:06-cv-03744
  1:06-cv-05325
  1:06-cv-03551
  1:06-cv-03621
  1:06-cv-03871
  1:06-cv-04736
  1:07-cv-03531
Cause: 15:1 Antitrust Litigation

Date Filed: 06/29/2006
Jury Demand: Both
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 06/29/2006 | 1 | CLASS action complaint filed by Richard Dennison, Stephen Hesano; Jury Demand.(las, ) (Entered: 06/29/2006) |
| 06/29/2006 | 2 | CIVIL Cover Sheet (las, ) (Entered: 06/29/2006) |
| 06/29/2006 | 3 | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Matthew Eric Van Tine (las, ) (Entered: 06/29/2006) |
| 06/29/2006 | 4 | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Jennifer Winter Sprengel (las, ) (Entered: 06/29/2006) |
| 06/29/2006 | 5 | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Marvin Alan Miller (las, ) (Entered: 06/29/2006) |
| 06/29/2006 | 6 | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Patrick Edward Cafferty (las, ) (Entered: 06/29/2006) |
| 06/30/2006 | 8 | *FIRST* AMENDED complaint by Richard Dennison against all defendants (Miller, Marvin) (Entered: 06/30/2006) |
| 06/30/2006 | 12 | SUMMONSES Issued, four originals and four copies, as to Defendants BP Products North America, Inc., Dennis Abbott, Mark Radley, Cody Claborn (ar, ) (Entered: 07/06/2006) |
| 07/05/2006 | 9 | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Marvin Alan Miller *Appearance of Christopher Lovell* (Miller, Marvin) (Entered: 07/05/2006) |

| 07/05/2006 | <u>10</u> | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Marvin Alan Miller *Appearance of Imtiaz Siddiqui* (Miller, Marvin) (Entered: 07/05/2006) |
|---|---|---|
| 07/05/2006 | <u>11</u> | ATTORNEY Appearance for Plaintiffs Richard Dennison, Stephen Hesano by Marvin Alan Miller *Appearance of Craig Essenmacher* (Miller, Marvin) (Entered: 07/05/2006) |
| 07/11/2006 | <u>13</u> | ATTORNEY Appearance for Plaintiffs by Christopher Lovell (ar, ) (Entered: 07/13/2006) |
| 07/11/2006 | <u>14</u> | ATTORNEY Appearance for Plaintiffs by Craig Essenmacher (ar, ) (Entered: 07/13/2006) |
| 07/11/2006 | <u>15</u> | ATTORNEY Appearance for Plaintiffs by Imtiaz A. Siddiqui (ar, ) (Entered: 07/13/2006) |
| 07/17/2006 | <u>16</u> | ATTORNEY Appearance for Defendant BP Products North America, Inc. by Kathryn Frances Taylor (Taylor, Kathryn) (Entered: 07/17/2006) |
| 07/17/2006 | <u>17</u> | NOTICE of Motion by Kathryn Frances Taylor for presentment of before Honorable James B. Zagel on 7/20/2006 at 10:15 AM. (Attachments: # <u>1</u> Agreed Motion for Extension to Time for BP Products North America, Inc. to Answer or Otherwise Respond to Plaintiffs' Complaint)(Taylor, Kathryn) (Entered: 07/17/2006) |
| 07/18/2006 | <u>18</u> | MOTION by Defendant BP Products North America, Inc. for extension of time to file answer *Agreed Motion for Extension of Time For BP Products North America, Inc. to Answer or Otherwise Plead* (Taylor, Kathryn) (Entered: 07/18/2006) |
| 07/20/2006 | <u>19</u> | MINUTE entry before Judge James B. Zagel : MOTION by Defendant BP Products North America, Inc. for extension of time to file answer agreed motion for extension of time For BP Products North America, Inc. to answer or otherwise plead until 8/21/2006 <u>18</u> is granted. Mailed notice (drw, ) (Entered: 07/20/2006) |
| 07/21/2006 | <u>20</u> | SUMMONS Returned Executed as to Dennis Abbott on 7/10/2006, answer due 7/31/2006 (Exhibit). (ar, ) (Entered: 07/26/2006) |
| 07/21/2006 | <u>21</u> | SUMMONS Returned Executed as to Cody Claborn on 7/10/2006, answer due 7/31/2006 (Exhibit). (ar, ) (Entered: 07/26/2006) |
| 07/21/2006 | <u>22</u> | SUMMONS Returned Executed as to Mark Radley on 7/10/2006, answer due 7/31/2006 (Exhibit). (ar, ) (Entered: 07/26/2006) |
| 07/27/2006 | <u>23</u> | ATTORNEY Appearance for Defendant BP Products North America, Inc. by Richard Cartier Godfrey (Godfrey, Richard) (Entered: 07/27/2006) |
| 07/28/2006 | <u>24</u> | ATTORNEY Appearance for Defendant BP Products North America, Inc. by Andrew A. Kassof (Kassof, Andrew) (Entered: 07/28/2006) |
| 08/21/2006 | <u>25</u> | MOTION by Defendant BP Products North America, Inc. for extension of time to file answer *Agreed Motion for Extension of Time for BP* |

| | | |
|---|---|---|
| | | *Products North America, Inc. to Answer or Otherwise Respond to Plaintiff's Complaint* (Taylor, Kathryn) (Entered: 08/21/2006) |
| 08/21/2006 | 26 | NOTICE of Motion by Kathryn Frances Taylor for presentment of motion for extension of time to file answer 25 before Honorable James B. Zagel on 8/24/2006 at 10:15 AM. (Taylor, Kathryn) (Entered: 08/21/2006) |
| 08/22/2006 | 27 | MINUTE entry before Judge James B. Zagel : Agreed Motion for Extension of Time for BP Products North America, Inc. to Answer or Otherwise Respond to Plaintiff's Complaint 25 is granted. (drw, ) (Entered: 08/22/2006) |
| 08/23/2006 | 28 | MDL NOTICE of Appearance for Defendant BP Products North America, Inc. by Richard Cartier Godfrey (ar, ) (Entered: 08/25/2006) |
| 08/23/2006 | 29 | CORPORATE Disclosure Statement pursuant to MDL Rule 5.3 by Defendant BP Products North America, Inc. (ar, ) (Entered: 08/25/2006) |
| 08/29/2006 | 30 | ATTORNEY Appearance for Defendant BP Products North America, Inc. by Richard Cartier Godfrey *(Revised)* (Godfrey, Richard) (Entered: 08/29/2006) |
| 08/31/2006 | 31 | ATTORNEY Appearance for Defendant BP Products North America, Inc. by David J. Zott (Zott, David) (Entered: 08/31/2006) |
| 09/07/2006 | 32 | MOTION to reassign case *for Finding of Relatedness* (Attachments: # 1 Exhibit Part 1# 2 Exhibit Part 2# 3 Exhibit Part 3)(Sweetnam, William) (Entered: 09/07/2006) |
| 09/07/2006 | 33 | NOTICE of Motion by William Michelangelo Sweetnam for presentment of motion to reassign case 32 before Honorable James B. Zagel on 9/12/2006 at 10:15 AM. (Sweetnam, William) (Entered: 09/07/2006) |
| 09/08/2006 | 34 | MINUTE entry before Judge James B. Zagel : Motion to reassign case 32 is entered and continued. Motion Hearing set for 9/19/2006 at 10:15 AM. Mailed notice (drw, ) (Entered: 09/08/2006) |
| 09/08/2006 | 35 | MOTION by Plaintiffs Richard Dennison, Stephen Hesano to appoint counsel *Plaintiffs' Motion to Appoint Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g)* (Miller, Marvin) (Entered: 09/08/2006) |
| 09/08/2006 | 36 | MEMORANDUM by Richard Dennison, Stephen Hesano in Support of motion to appoint counsel 35 *Plaintiffs' Memorandum of Law in Support of Motion to Appoint Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g)* (Miller, Marvin) (Entered: 09/08/2006) |
| 09/08/2006 | 37 | NOTICE of Motion by Marvin Alan Miller for presentment of motion to appoint counsel 35 before Honorable James B. Zagel on 9/19/2006 at 10:15 AM. (Miller, Marvin) (Entered: 09/08/2006) |
| 09/11/2006 | 38 | MOTION to appoint counsel *Direct Purchaser Plaintiffs' Motion and Memorandum of Law in Support of Motion to Appoint Interim Class Counsel in the Direct Purchaser Actions Pursuant to Fed.R.Civ.P. 23(g)* |

| | | |
|---|---|---|
| | | (London, William) (Entered: 09/11/2006) |
| 09/11/2006 | 39 | NOTICE of Motion by William Henry London for presentment of motion to appoint counsel38 before Honorable James B. Zagel on 9/19/2006 at 10:15 AM. (London, William) (Entered: 09/11/2006) |
| 09/11/2006 | 40 | STATEMENT *Direct Purchaser Plaintiffs' Joint Response to the Motion for Finding of Relatedness Filed By Plaintiffs Nebel, Plaut and Mullins* (London, William) (Entered: 09/11/2006) |
| 09/11/2006 | 41 | CERTIFICATE of Service by William Henry London on behalf of SCHAGRINGAS Co., Styer Propane, LLC regarding statement40, notice of motion39, MOTION to appoint counsel *Direct Purchaser Plaintiffs' Motion and Memorandum of Law in Support of Motion to Appoint Interim Class Counsel in the Direct Purchaser Actions Pursuant to Fed.R.Civ.P. 23(g)*38 (London, William) (Entered: 09/11/2006) |
| 09/12/2006 | 42 | ATTORNEY Appearance for Plaintiffs Kurt Nebel, H. Steven Plaut, Drew Halpern by Paul M. Weiss *Also David A. Mullins III* (Weiss, Paul) (Entered: 09/12/2006) |
| 09/12/2006 | 43 | ATTORNEY Appearance for Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern by William Michelangelo Sweetnam (Sweetnam, William) (Entered: 09/12/2006) |
| 09/14/2006 | 44 | RESPONSE by BP Products North America, Inc.in Support of MOTION to reassign case *for Finding of Relatedness*32 *Defendant BP Products North America, Inc.'s Response in Support of Plaintiffs' Motion for a Finding of Relatedness and Motion for Reassignment* (Attachments: # 1 Exhibit A# 2 Exhibit B)(Godfrey, Richard) (Entered: 09/14/2006) |
| 09/15/2006 | 45 | MOTION by Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern to appoint counsel *Interim Class Counsel* (Attachments: # 1 Exhibit Group Exhibit A)(Weiss, Paul) (Entered: 09/15/2006) |
| 09/15/2006 | 46 | NOTICE of Motion by Paul M. Weiss for presentment of motion to appoint counsel45 before Honorable James B. Zagel on 9/19/2006 at 10:15 AM. (Weiss, Paul) (Entered: 09/15/2006) |
| 09/19/2006 | 47 | MINUTE entry before Judge James B. Zagel : Motion hearing held on 9/19/2006. MOTION for Finding of Relatedness 32 is granted. MOTION to appoint counsel Interim Class Counsel for Direct Purchaser Plaintiffs' pursuant to Fed.R.Civ.P. 23(g) 38 is granted. MOTION by Plaintiffs Richard Dennison, Stephen Hesano to appoint counsel Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g) 35 and MOTION by Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern to appoint counsel Interim Class Counsel 45 ominbus responses due by 10/3/2006. Replies due by 10/10/2006. Status hearing set for 10/12/2006 at 10:00 a.m. Mailed notice (drw, ) (Entered: 09/19/2006) |
| 09/19/2006 | 48 | MINUTE entry before Judge James B. Zagel : Status hearing set for 10/12/2006 at 10:00 AM. Mailed notice (drw, ) (Entered: 09/19/2006) |
| | | |

| 09/19/2006 | 49 | SUMMONSES Issued, three originals and three copies, as to Defendants Dennis Abbott, Mark Radley, Cody Claborn (ar, ) (Entered: 09/20/2006) |
|---|---|---|
| 09/29/2006 | 50 | SUPPLEMENT by Kurt Nebel to motion to appoint counsel45 *Memorandum of Law* (Sweetnam, William) (Entered: 09/29/2006) |
| 10/03/2006 | 51 | MEMORANDUM motion to appoint counsel35 by Richard Dennison, Stephen Hesano *Plaintiffs' Memorandum of Law in Support of Motion to Appoint Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g)* (Miller, Marvin) (Entered: 10/03/2006) |
| 10/06/2006 | 52 | STIPULATION *for Extension of Time to File Responsive Pleadings* (Miller, Marvin) (Entered: 10/06/2006) |
| 10/10/2006 | 53 | RESPONSE by BP Products North America, Inc. to MOTION by Plaintiffs Richard Dennison, Stephen Hesano to appoint counsel *Plaintiffs' Motion to Appoint Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g)*35, MOTION by Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern to appoint counsel *Interim Class Counsel*45 (Ehrhart, Katheleen) (Entered: 10/10/2006) |
| 10/10/2006 | 54 | ATTORNEY Appearance for Defendant Mark Radley by Monte Loren Mann (Mann, Monte) (Entered: 10/10/2006) |
| 10/10/2006 | 55 | REPLY by Kurt Nebelin Support of MOTION by Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern to appoint counsel *Interim Class Counsel*45 (Attachments: # 1 Affidavit Paul M. Weiss# 2 Affidavit Gary S. Graifman# 3 Affidavit William Harte# 4 Affidavit William M. Sweetnam)(Weiss, Paul) (Entered: 10/10/2006) |
| 10/10/2006 | 56 | REPLY by Plaintiffs Richard Dennison, Stephen Hesano *Reply in Further Support of Application for Appointment of Interim Class Counsel* (Miller, Marvin) (Entered: 10/10/2006) |
| 10/11/2006 | 57 | NOTICE by Kurt Nebel re reply to response to motion, 55 (Attachments: # 1 Exhibit Exhibit 1# 2 Declaration Declaration of Tod Aronovitz) (Weiss, Paul) (Entered: 10/11/2006) |
| 10/11/2006 | 58 | STIPULATION *for Extension of Defendant Radley's Time to File Responsive Pleadings* (Mann, Monte) (Entered: 10/11/2006) |
| 10/12/2006 | 73 | MINUTE entry before Judge James B. Zagel : Motion to appoint counsel 45 is entered and continued. Ruling to be made by mail. Status hearing held on 10/12/2006. Mailed notice (drw, ) (Entered: 11/14/2006) |
| 10/17/2006 | 59 | MINUTE entry before Judge James B. Zagel : MOTION by Plaintiffs Richard Dennison, Stephen Hesanoto Appoint Interim Class Counsel for indirect purchaser plaintiffs Pursuant to Fed. R. Civ. P. 23(g) 35 is granted. Mailed notice (drw, ) (Entered: 10/17/2006) |
| 10/17/2006 | 60 | SUMMONS Returned Executed by Richard Dennison, Stephen Hesano as to Dennis Abbott on 9/20/2006, answer due 10/10/2006. (td, ) (Entered: 10/19/2006) |

| | | |
|---|---|---|
| 10/17/2006 | <u>61</u> | SUMMONS Returned Executed by Richard Dennison, Stephen Hesano as to Cody Claborn on 9/20/2006, answer due 10/10/2006. (td, ) (Entered: 10/19/2006) |
| 10/17/2006 | <u>62</u> | SUMMONS Returned Executed by Richard Dennison, Stephen Hesano as to Mark Radley on 9/20/2006, answer due 10/10/2006. (td, ) (Entered: 10/19/2006) |
| 11/02/2006 | <u>63</u> | ATTORNEY Appearance *of Edward A. Wallace for Plaintiffs Donald and Jennifer Terry* (Wallace, Edward) (Entered: 11/02/2006) |
| 11/02/2006 | <u>64</u> | CERTIFICATE of Service by Edward Anthony Wallace on behalf of Donald Terry, Jennifer Terry regarding attorney appearance<u>63</u> (Wallace, Edward) (Entered: 11/02/2006) |
| 11/02/2006 | <u>65</u> | ATTORNEY Appearance for Plaintiffs Donald Terry, Jennifer Terry by Kenneth A. Wexler (Attachments: # <u>1</u> Certificate of Service)(Wexler, Kenneth) (Entered: 11/02/2006) |
| 11/02/2006 | <u>66</u> | ATTORNEY Appearance for Plaintiffs Donald Terry, Jennifer Terry by Amber Margaret Nesbitt (Attachments: # <u>1</u> Certificate of Service) (Nesbitt, Amber) (Entered: 11/02/2006) |
| 11/13/2006 | <u>67</u> | MOTION by Plaintiffs Richard Dennison, Stephen HesanoInterim Lead Counsel's Motion for Entry of Case Management Order Associated Cases: 1:06-cv-03541,1:06-cv-03837,1:06-cv-04577(Miller, Marvin) (Entered: 11/13/2006) |
| 11/13/2006 | <u>68</u> | NOTICE of Motion by Marvin Alan Miller for presentment of motion for miscellaneous relief<u>67</u> before Honorable James B. Zagel on 11/16/2006 at 10:15 AM. (Miller, Marvin) (Entered: 11/13/2006) |
| 11/13/2006 | <u>69</u> | MOTION by Defendant BP Products North America, Inc. For Finding of Relatedness And Reassignment (Attachments: # <u>1</u> Exhibit A# <u>2</u> Exhibit B)Associated Cases: 1:06-cv-03541,1:06-cv-03837,1:06-cv-04577 (Taylor, Kathryn) (Entered: 11/13/2006) |
| 11/13/2006 | <u>70</u> | NOTICE of Motion by Kathryn Frances Taylor for presentment of motion for miscellaneous relief<u>69</u> before Honorable James B. Zagel on 11/16/2006 at 10:15 AM. (Taylor, Kathryn) (Entered: 11/13/2006) |
| 11/13/2006 | <u>71</u> | MOTION to appoint counsel *and to Modify Order Appointing Interim Class Counsel* (Attachments: # <u>1</u> Exhibit resumes of certain counsel for Patten's Gas)Associated Cases: 1:06-cv-03541,1:06-cv-03837,1:06-cv-04577(Barnow, Ben) (Entered: 11/13/2006) |
| 11/13/2006 | <u>72</u> | *Plaintiff Patten's Gas'* NOTICE of Motion by Ben Barnow for presentment of motion to appoint counsel<u>71</u> before Honorable James B. Zagel on 11/16/2006 at 10:15 AM. (Barnow, Ben) (Entered: 11/13/2006) |
| 11/15/2006 | <u>74</u> | MDL-1801 ORDER, dated 11/06/06, withdrawing transfer to USDC for the Western District of Oklahoma (Exhibit). (ar, ) (Entered: 11/17/2006) |
| 11/16/2006 | <u>78</u> | MINUTE entry before Judge James B. Zagel :Motion to appoint counsel |

|  |  |  |
|---|---|---|
|  |  | 45 is granted. Motion to appoint counsel 67 is granted. Motion to appoint counsel 69 is granted; Motion to appoint counsel 71 is granted. Mailed notice (drw, ) (Entered: 12/27/2006) |
| 11/17/2006 | 75 | APPLICATION for Leave to Appear Pro Hac Vice on behalf of Mark Radley by Glenn R. Reichardt; Order entered granting leave by Judge James B. Zagel. Filing fee $50.00 paid, receipt number 10644831. (ar, ) (Entered: 11/29/2006) |
| 12/20/2006 | 76 | MOTION by Defendant BP Products North America, Inc.Finding of Relatedness And Reassignment of Cases *Defendant BP Products North America, Inc.'s Agreed Motion for Finding of Relatedness and Reassignment* (Attachments: # 1 Exhibit A# 2 Exhibit B)(Taylor, Kathryn) (Entered: 12/20/2006) |
| 12/20/2006 | 77 | NOTICE of Motion by Kathryn Frances Taylor for presentment of motion for miscellaneous relief, 76 before Honorable James B. Zagel on 12/28/2006 at 10:15 AM. (Taylor, Kathryn) (Entered: 12/20/2006) |
| 12/27/2006 | 79 | MINUTE entry before Judge James B. Zagel :Motion for finding of relatedness and reassignment 76 is granted.Mailed notice (drw, ) (Entered: 12/27/2006) |
| 01/18/2007 | 80 | SEVENTH CIRCUIT transcript information sheet by BP Products North America, Inc. (ar, ) (Entered: 01/19/2007) |
| 01/18/2007 | 81 | TRANSCRIPT of proceedings for the following dates: 10/12/06 before the Honorable James B. Zagel. (ar, ) (Entered: 01/19/2007) |
| 01/23/2007 | 82 | NOTICE by all plaintiffs *of filing Notice of Change of Firm Affiliaition of Marvin A. Miller and Matthew Van Tine* (Miller, Marvin) (Entered: 01/23/2007) |
| 02/15/2007 | 83 | ATTORNEY Appearance for Plaintiff Parke J. Patten, Inc. by Sharon Harris (Harris, Sharon) (Entered: 02/15/2007) |
| 02/21/2007 | 84 | ATTORNEY Appearance for Plaintiff Parke J. Patten, Inc. by Sharon Harris *(Corrected)* (Harris, Sharon) (Entered: 02/21/2007) |
| 03/07/2007 | 85 | NOTICE by Adam R. Gonnelli of Change of Address (Gonnelli, Adam) (Entered: 03/07/2007) |
| 07/12/2007 | 86 | MOTION by Defendant BP Products North America, Inc.Finding of Relatedness *BP Products North America, Inc.'s Agreed Motion for Finding of Relatedness and Reassignment of Case* (Attachments: # 1 Exhibit A)(Taylor, Kathryn) (Entered: 07/12/2007) |
| 07/12/2007 | 87 | NOTICE of Motion by Kathryn Frances Taylor for presentment of motion for miscellaneous relief86 before Honorable James B. Zagel on 7/17/2007 at 10:15 AM. (Taylor, Kathryn) (Entered: 07/12/2007) |
| 07/17/2007 | 88 | MINUTE entry before Judge James B. Zagel :Motion for a finding of relatedness and for reassignment 86 is granted.Mailed notice (drw, ) (Entered: 07/17/2007) |

Case 1:08-cv-03362    Document 4    Filed 02/29/2008    Page 69 of 102

| 07/30/2007 | 89 | NOTICE by Marvin Alan Miller of Change of Address (Miller, Marvin) (Entered: 07/30/2007) |
| 11/28/2007 | 90 | ATTORNEY Appearance for Defendant Cody Claborn by Kevin Michael Flynn (Flynn, Kevin) (Entered: 11/28/2007) |
| 11/28/2007 | 91 | APPLICATION for Leave to Appear Pro Hac Vice on behalf of Cody Claborn by Ryan K. Higgins; Order entered granting leave by Judge James B. Zagel. Filing fee $ 50 paid, receipt number 10342190. (gmr, ) (Entered: 12/05/2007) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/27/2008 10:38:21 | | | |
| **PACER Login:** | ke2194 | **Client Code:** | 10270-1064 |
| **Description:** | Docket Report | **Search Criteria:** | 1:06-cv-03541 |
| **Billable Pages:** | 5 | **Cost:** | 0.40 |

**EXHIBIT 5**

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 2.5
### Eastern Division

Richard Dennison, et al.

                      Plaintiff,

v.

                                       Case No.: 1:06−cv−03541
                                       Honorable James B. Zagel

BP Products North America, Inc., et al.

                     Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Tuesday, September 19, 2006:

      MINUTE entry before Judge James B. Zagel : Motion hearing held on 9/19/2006. MOTION for Finding of Relatedness [32] is granted. MOTION to appoint counsel Interim Class Counsel for Direct Purchaser Plaintiffs' pursuant to Fed.R.Civ.P. 23(g) [38] is granted. MOTION by Plaintiffs Richard Dennison, Stephen Hesano to appoint counsel Interim Class Counsel Pursuant to Fed. R. Civ. P. 23(g) [35] and MOTION by Plaintiffs Kurt Nebel, H. Steven Plaut, David A. Mullins, III, Drew Halpern to appoint counsel Interim Class Counsel [45] ominbus responses due by 10/3/2006. Replies due by 10/10/2006. Status hearing set for 10/12/2006 at 10:00 a.m.Mailed notice(drw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**EXHIBIT 6**

Order Form (01/2005)    Case 1:06-cv-03541    Document 59    Filed 10/17/2006    Page 1 of 2

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 3541 | **DATE** | October 17, 2006 |
| **CASE TITLE** | DENNISON ET AL v. BP PRODUCTS NORTH AMERICA, INC., ET AL | | |

**DOCKET ENTRY TEXT:**

*Dennison* Plaintiffs' motion to appoint interim counsel for indirect purchaser Plaintiffs is granted.

### STATEMENT

On September 19, I granted a motion pursuant to Local Rule 40.4 finding various actions filed against BP Products North America, Inc. to be related. These actions fall into two main categories: those initiated by direct purchaser Plaintiffs, and those initiated by indirect purchaser Plaintiffs.

Also on September 19, I granted a motion pursuant to Fed. R. Civ. P. 23(g) appointing interim counsel for the direct purchaser Plaintiffs. Before me now is Plaintiffs' motion to appoint interim counsel for the indirect purchaser Plaintiffs. There are two competing factions among the indirect purchaser Plaintiffs; each has filed separate motions seeking the appointment of different counsel.

The appointment of class counsel is governed by Fed. R. Civ. P. 23(g). Although a class has not been certified in this case, I may nevertheless appoint interim counsel "to act on behalf of the putative class before determining whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(2)(A). "No distinction is made regarding appointing interim counsel." *Hill v. The Tribune Company, et al*, No. 05-2602, 2005 WL 3299144 *3 (N.D.Ill. Oct. 13, 2005). Even if there is only one applicant, I will only appoint that applicant "if the applicant is adequate under Rule 23(g)(1)(B) and (C)." Fed. R. Civ. P. 23(g)(2)(B). In a case such as this one – where there is more than one adequate applicant – I will appoint "the applicant best able to represent the interests of the class." *Id.*

Rule 23(g)(1)(C) contains the standards used to assess applicants. It states, that I must consider: "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; counsel's knowledge of the applicable law; and the resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(C). Moreover, I may also "consider any other matter pertinent to counsel's ability to fairly

## STATEMENT

and adequately represent the interests of the class." *Id.*

The two groups competing for appointment of interim counsel are the *Dennison* Plaintiffs and the *Nebel* Plaintiffs. The *Dennison* Plaintiffs ask me to designate the firm Lovell Stewart Halebian, LLP as Chair of the Interim Lead counsel. They further seek the appointment of Wexler Toriseva Wallace LLP; Kirby, McInerney & Squire, LLP; Futterman Howard Watkins Wylie & Ashley Chtd.; and Miller Faucher and Cafferty LLP as Interim Lead Counsel.

The *Nebel* Plaintiffs ask that I appoint their counsel as Interim Class Counsel for putative statewide indirect purchaser classes for the states of Florida, North Carolina, Kentucky and New York.

Depending on the contours of the split, dividing up the group in the way the *Nebel* Plaintiffs suggest may or may not ultimately be practical. Further, even if such a split is practical, it may or may not be wise. However, that is a decision that should not be made unless and until we reach the point of making a final, rather than an interim selection.

I cannot overstate the following: whoever gains the role of Interim Lead Counsel will be given no advantage in the final selection of class counsel. That is to say, interim means interim. That said, it is best if, in the interim, counsel is a single team. Accordingly, and after considering all of the factors in Fed. R. Civ. P. 23(g)(C) (which, if a class or classes is certified, I will have to reconsider *de novo*), I am granting the *Dennison* Plaintiff's motion, and appointing Lovell Stewart Halebian, LLP as Chair of the Interim Lead counsel, and Wexler Toriseva Wallace LLP; Kirby, McInerney & Squire, LLP; Futterman Howard Watkins Wylie & Ashley Chtd.; and Miller Faucher and Cafferty LLP as Interim Lead Counsel.

**EXHIBIT 7**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **RICHARD DENNISON and STEPHEN HESANO,** **Individually and on behalf of all others similarly situated,** **Plaintiffs,** v. **BP NORTH AMERICA PRODUCTS, INC.,** *et al.,* **Defendants.** | **No. 06 C 3541** **AND RELATED INDIRECT PURCHASER CASES** **Judge James B. Zagel** |

**CASE MANAGEMENT ORDER NO. 1**

WHEREAS, plaintiffs have filed Complaints (the "Complaints") in the above-referenced actions for alleged violations of various state antitrust laws and unjust enrichment involving Propane Gas;

WHEREAS, Plaintiffs believe that defendants intend to deny such allegations;

WHEREAS, plaintiffs seek to proceed on behalf of a proposed class of similarly-situated indirect purchasers of propane; and

WHEREAS, plaintiffs and defendants believe consolidation of the Complaints will avoid unnecessary costs and promote the efficient conduct of proceedings therein;

NOW, THEREFORE, THE COURT ORDERS as follows:

**I.    CONSOLIDATION AND COORDINATION**

1.    The actions identified in the captions hereto are consolidated pursuant to Fed. R. Civ. P. 42(a) for all purposes.  Any subsequently filed, transferred or re-assigned case within this district brought on behalf of a proposed class of indirect purchasers of propane gas, that arises out of the same operative facts as the above-captioned actions, shall be consolidated with these actions and be subject to this Case Management Order No. 1 (the "Order").  The current actions and those

that may be consolidated with the current actions are collectively referred to as the "Consolidated Indirect Purchaser Actions."

      2.     The terms of this Order shall not have the effect of making any person, firm, or corporation a party to any action in which he, she, or it has not been named, served, or added as such, in accordance with the Federal Rules of Civil Procedure. The terms of this Order and the consolidation ordered herein shall not constitute a waiver by any party of any claims in or defenses to any of the actions.

**II.**      **<u>CAPTION OF CASES</u>**

      3.     All pleadings filed in this Consolidated Indirect Purchaser Action shall bear the following caption:

| | |
|---|---|
| IN RE: BP PROPANE INDIRECT PURCHASER ) <br> ANTITRUST LITIGATION ) <br> ) | No. 06 C 3541 <br> Judge James B. Zagel |

**III.**      **<u>NEWLY FILED OR TRANSFERRED ACTIONS</u>**

      4.     This Court requests the assistance of counsel in calling to the attention of this Court the filing or transfer of any case which might properly be consolidated as part of the Consolidated Indirect Purchaser Actions.

      5.     This Order shall apply to each such case which is found to be related and/or consolidated unless a party objecting to the coordination or consolidation of such case or to provision of this Order shall, within ten (10) days after the date upon which an Order is mailed to counsel for such party, file an application for relief from this provision and this Court deems it appropriate to grant such application.

IV.     <u>ORGANIZATION OF COUNSEL</u>

      6.     By order dated ____, 2006, the Court designated as Interim Lead Counsel the following to act on behalf of all plaintiffs in the Consolidated Indirect Purchaser Actions.

**Christopher Lovell**
**LOVELL STEWART & HALABIAN LLP**
**500 Fifth Avenue**
**New York, NY**
**(212) 608-1900**

Chairman of Interim Lead Counsel

**Kenneth A. Wexler**
**WEXLER TORISEVA WALLACE LLP**
**One North LaSalle Street, Suite 2000**
**Chicago, IL 60602**
**(312) 346-2222**

**Daniel Hume**
**Kirby, McInerny & Squire**
**830 Third Avenue**
**New York, NY 10022**
**(212) 371-6600**

**Ronald Futterman**
**FUTTERMAN HOWARD WATKINS**
      **WYLIE & ASHLEY, Chtd.**
**122 South Michigan Avenue, Suite 1850**
**Chicago, IL 60603**
**(312) 427-3600**

**Marvin A. Miller**
**MILLER FAUCHER AND CAFFERTY LLP**
**30 NORTH LASALLE STREET**
**CHICAGO, IL 60602**
**(312) 782-4880**

7.    Defendant's counsel of record are:

> **Richard C. Godfrey, P.C.**
> **David Zott**
> **Andrew A. Kassof**
> **Kathleen Ehardt**
> **Kathryn F. Taylor**
> **Khara Coleman**
> **Kirkland & Ellis LLP**
> **200 East Randolph Drive**
> **Chicago, IL 60601**
> *(312) 861-2000*

8.    Until further order of Court, Interim Lead Counsel in the Consolidated Indirect Purchaser Actions is charged with performing, on behalf of all plaintiffs in the Consolidated Indirect Purchaser Actions, administrative matters such as communications with clerical staff of the Court and with other counsel (including receiving and distributing notices, orders, motions and briefs on behalf of the group), advising parties of developments in the case, and otherwise assisting in the coordination of activities and positions.

9.    Interim Lead Counsel in the Consolidated Indirect Purchaser Actions, working together in a coordinated fashion, shall have sole authority over the following matters on behalf of all plaintiffs in the Consolidated Indirect Purchaser Actions: (a) convening meetings of counsel; (b) initiation, response, scheduling, briefing, and argument of all motions; (c) the scope, order, and conduct of all discovery proceedings; (d) such work assignments to other counsel as they may deem appropriate; (e) collecting time and expense reports from such other counsel on a periodic basis; (f) the retention of experts; (g) designation of which attorneys may appear at hearings and conferences with the Court; (h) the timing and substance of any settlement negotiations with defendants; (i) the allocation of fees, if any are awarded by the Court; and (j) other matters concerning the prosecution of the Consolidated Indirect Purchaser Actions Interim Lead Counsel

shall be responsible for the overall direction and administration of the Consolidated Indirect Purchaser Actions.

10.     No motion shall be initiated or filed on behalf of any plaintiff in the Consolidated Indirect Purchaser Actions except through the respective Co-Lead Counsel.

11.     Interim Lead Counsel in the Consolidated Indirect Purchaser Actions, or their designees, shall have sole authority to communicate with Defendants' Counsel and the Court on behalf of all plaintiffs in the Consolidated Indirect Purchaser Actions.  Defendants' Counsel may rely on all agreements made with Co-Lead Counsel and Liaison Counsel in the Consolidated Indirect Purchaser Actions, and such agreements shall be binding on all counsel in the Consolidated Indirect Purchaser Actions.

12.     The organizational structure of Plaintiffs' counsel established by this Court's order dated _____, 2006 and adopted herein shall likewise apply to any and all related and/or consolidated actions.

13.     **Time Records**.  All plaintiffs' counsel in the Consolidated Indirect Purchaser Actions shall keep contemporaneous time records and shall periodically submit summaries or other records of time and expenses to Co-Lead Counsel, or their designee.

## V.     <u>FILING AND SERVICE OF DOCUMENTS</u>

14.     The Parties shall file and serve all papers in accordance with the Electronic Case Filing Policies and Procedures ("ECF Procedures") of this Court.  Defendants' service of papers by ECF Procedures on each Co-Lead Counsel constitutes service on Plaintiffs.  Plaintiffs shall serve papers on Defendants by ECF Procedures.  To the extent that papers are filed under seal, the papers shall be served on counsel listed in paragraphs 15 and 16.

## VI.    PRESERVATION OF DOCUMENTS

15.    During this litigation, or until further order of this Court, the parties shall take reasonable steps to preserve all documents within their possession, custody, or control, including computer and electronically generated and stored information and materials such as computerized data and electronic mail, containing information that is relevant to or may lead to the discovery of information relevant to the subject matter of the pending litigation.  Nothing in this paragraph is intended to change or otherwise modify the parties' obligations under the Federal Rules of Civil Procedure.

## VII.    MODIFICATION

16.    Any party may, for good cause shown, move for modification of any provision of this Order.


SO ORDERED:


DATED: _____        _____
                                                    **James B. Zagel**
                                         **UNITED STATES DISTRICT JUDGE**

**EXHIBIT 8**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SCHAGRINGAS CO., Individually and on Behalf of all Others Similarly Situated, | : : : | Civil Action No. 06-CV-3621 |
| v. | : : | |
| BP PRODUCTS NORTH AMERICA, INC., et al. | : | |

| | | |
|---|---|---|
| STYER PROPANE, LLC, Individually and on Behalf of all Others Similarly Situated, | : : | Civil Action No. 06-CV-3871 |
| v. | : : | |
| BP PRODUCTS NORTH AMERICA, INC., et al. | : | |

| | | |
|---|---|---|
| PARKE J. PATTEN, INC., d/b/a PATTEN INC., OR PATTEN'S GAS, Individually and on Behalf of all Others Similarly Situated, | : : : | Civil Action No. 06-CV-5325 |
| v. | : : : | |
| BP PRODUCTS NORTH AMERICA, Inc., et al. | : | |

## [            ] CASE MANAGEMENT ORDER NO. 1

AND NOW, this _27th_ day of _MARch_, 2007, it is hereby ORDERED and DECREED as follows:

### CONSOLIDATION AND PROCEDURES FOR FILING AND DOCKETING

**I.    Order of Consolidation**

**A.**    The above-captioned Direct Purchaser Actions and any similar actions that may hereafter be filed in or transferred to this Court (collectively, the "Direct Purchaser Actions") are hereby consolidated for all purposes pursuant to Rule 42(a) of the Federal Rules of Civil

Procedure. Such actions shall be collectively referred to as "In re: BP Propane Direct Purchaser Antitrust Litigation, Master File No. 1:06-CV-3621."

**B.**    Nothing in this Order shall have the effect of making any person or entity a party to any action in which he, she or it has not been named, served or added in accordance with the Federal Rules of Civil Procedure.

## II.    MASTER DOCKET, CASE FILE, AND SEPARATE ACTION FILES

A Master Docket and Case File is hereby established for the consolidated pretrial proceedings in the Direct Purchaser Actions. The Master File shall be Civil Action No. 1:06-CV-3621. The original of this Order shall be filed by the Clerk of Court in the Master File herein established. The Clerk of Court shall maintain a separate file for each action that is or may be consolidated, and filings shall be made therein in accordance with the regular procedures of the Clerk of Court. The Clerk of Court shall file a copy of this Order in each such separate file.

## III.    CAPTION OF CASES

**A.**    Every pleading filed in the Direct Purchaser Actions, or in any separate action included therein, shall bear the following caption:

| | |
|---|---|
| IN RE: SCHAGRINGAS CO ~~DIRECT PURCHASER~~ ~~v.~~ BP PRODUCTS, ET AL <br><br> This Document Relates To: | Master File No. 1:06-CV-3621 <br> The Honorable James B. Zagel |

2

**B.**     When a filing is intended to apply to all Direct Purchaser Actions governed by this Order, the words "All Direct Purchaser Actions" shall appear immediately after the words, "This Document Relates To:" in the caption set out above.  When a pleading is intended to apply only to some, but not all, of the Direct Purchaser Actions, this Court's docket number for each individual action to which the pleading is intended to apply and the caption of that action, *e.g.*, "Schagringas Co. v. BP Products North America, Inc., et al., No. 1:06-CV-3621" shall appear immediately after the words "This Document Relates To."

## IV.   FILING AND DOCKETING

**A.**     When a paper is filed and the caption, pursuant to Section III above, shows that it is to be applicable to "All Direct Purchaser Actions," the Clerk of Court shall file such paper in the Master File and note such filing on the Master Docket.  No further papers need be filed or docket entries made.

**B.**     When a paper is filed and the caption, pursuant to Section III above, shows that it is to be applicable to less than all of the Direct Purchaser Actions that may have been consolidated, the Clerk of Court shall file the original of such paper in the Master File and a copy in the file of each specific action to which the paper is intended to be applicable, and shall note such filing in the Master Docket and in the docket of each such action.

## V.   NEWLY-FILED OR TRANSFERRED ACTIONS

If a civil action brought by or on behalf of a direct purchaser relates to the same subject matter as In re:  BP Propane Direct Purchaser Antitrust Litigation, Master File No. 1:06-CV-3621, is hereafter filed in or transferred to this Court, the Clerk of Court shall:

**A.**     File a copy of this Order in the separate file for such action.

**B.**     Mail a copy of the notice of assignment to counsel for plaintiffs and counsel for the defendant(s) in the actions consolidated.

**C.**     Make an appropriate entry in the Master Docket.

**D.**     Mail a copy of this Order to the attorneys for the plaintiff(s) in the newly-filed or transferred case.

**E.**     Upon the first appearance of any new defendant(s), add such newly-added defendant(s) to the Master Docket and mail a copy of this Order to counsel for the newly-added defendant(s).

The Court requests the assistance of counsel in calling to the attention of the Clerk of Court the filing or transfer of any case that might properly be consolidated for pretrial purposes with <u>In re: BP Propane Direct Purchaser Antitrust Litigation</u>, Master File No. 1:06-CV-3621.

**VI.     <u>APPLICATION OF THIS ORDER TO SUBSEQUENTLY-FILED CASES</u>**

This Order shall apply to subsequently filed or transferred civil actions brought by and on behalf of direct purchasers of Propane that assert claims similar to those set forth in <u>In re: BP Propane Direct Purchaser Antitrust Litigation</u>, Master File No. 1:06-CV-3621. The Court may exempt a subsequent case from application of this provision if good cause is shown upon motion of a party moving for relief from this Order within twenty (20) days after the date on which the Clerk of Court mails a copy of this Order to counsel for that party.

**VII.     <u>ELECTRONIC FILING AND SERVICE</u>**

**A.**     The procedures for electronic filing and service of documents specified in Local Rule 5.2 of this Court, as well as the General Order on Electronic Case Filing dated November 16, 2004 and revised May 19, 2005 and May 21, 2006, shall apply and be observed by all parties.

**B.**     Counsel for all parties shall apply for Filing User status (as defined in the General Order on Electronic Case Filing) by March 15, 2007.

C.    After March 15, 2007, counsel shall only be required to electronically serve documents filed in In re: BP Propane Direct Purchaser Antitrust Litigation, Master File No. 1:06-CV-3621 via this Court's Electronic Case Filing system.

## VIII. SCHEDULE

### A. Pleadings and Initial Motions

- Direct Purchaser Plaintiffs' Consolidated Complaint ("Complaint"): **March 15, 2007.** This pleading shall not be deemed an amended complaint within the meaning of Fed. R. Civ. P. 15, and Direct Purchaser Plaintiffs reserve the right to file an amendment as of right at any time prior to Defendants' filing an Answer or Motion in Response to the Complaint.

- Pursuant to the Court's Order at the hearing held on October 12, 2006, Defendants' Answer or Motion in Response to Complaint shall be due twenty-eight days after the filing of the Direct Purchaser Plaintiffs' Consolidated Complaint: **April 12, 2007**[1]

- Direct Purchaser Plaintiffs' Opposition to Defendants' Motions (if filed): **May 10, 2007**

- If Direct Purchaser Plaintiffs believe discovery is required in order to reply to a Motion filed by Defendants, the parties shall meet and confer on the issue and, if in agreement, shall submit a revised proposed Order to the Court for approval by **April 26, 2007.**  Absent agreement, the Direct Purchaser Plaintiffs reserve their right to seek such discovery, and Defendants reserve their right to object to such discovery.

### B. Subsequent Proceedings

- Within 30 days after any decision by the Court with respect to motions filed in response to the Complaint, or within 30 days after the filing of an answer to the Complaint if no motion is filed, the Court shall convene a status conference to set a schedule for the remaining stages of the litigation.

- After the date for the status conference is set, the parties shall meet and confer in an effort to reach agreement on a schedule for subsequent proceedings. The parties shall submit a single document to the Court setting forth an agreed schedule or, if no agreement is reached, the document shall set forth the areas

---

[1] The parties advise the Court of their understanding that the United States Department of Justice ("DOJ") intends to move for a stay of the consolidated Direct Purchaser and Indirect Purchaser cases. Thus, the deadline for defendants' answer or motion in response to the Consolidated Complaint, as well as any reply to defendants' motions (if filed), may be affected by the filing of and/or ruling on any such motion by the DOJ.

5

of agreement and areas of disagreement. The foregoing document shall be submitted to the Court 10 days prior to the scheduled date for the status conference described above.

Dated: MARch 27 , 2007

_____
JAMES B. ZAGEL
UNITED STATES DISTRICT JUDGE

**EXHIBIT 9**

**BEFORE THE JUDICIAL PANEL ON**
**MULTI-DISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| BP PRODUCTS NORTH AMERICA, INC. | ) | MDL Docket No. _____ |
| ANTITRUST LITIGATION | ) | |
| | ) | |

**MOTION OF BP PRODUCTS NORTH AMERICA, INC. FOR**
**TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS**
**PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED**
**PRETRIAL PROCEEDINGS**

BP Products North America, Inc. ("BPPNA"), the defendant in the case styled *Koch Supply & Trading, L.P. v. BP Products North America, Inc.*, United States District Court for the Southern District of Texas No. 4:08-cv-00377, files this motion for consolidation and transfer of pretrial proceedings under 28 U.S.C. § 1407. In support of its motion, BPPNA states as follows:

      1.      BPPNA is filing this Motion to Transfer so that the recently-filed *Koch* case can be administered along with the eighteen other actions that allege the same causes of action arising out of the same set of alleged facts (the "Related Cases"). All of the Related Cases are currently pending in the United States District Court for the Northern District of Illinois.

      2.      Judicial economy and conservation of the resources of all parties weigh heavily in favor of transferring the newly-filed *Koch* case to the same Court where the other eighteen Related Cases are already pending so that it may be consolidated with the Related Cases.

3.    The Northern District of Illinois is an appropriate forum for all of the Related Cases, including *Koch*.  Plaintiffs and their counsel in eighteen other cases have recognized the Northern District of Illinois as the natural home for these cases, BPPNA is headquartered in Illinois, and the Northern District of Illinois has already performed substantial work to consolidate and handle the Related Cases.

In further support of its motion, BPPNA submits an accompanying Brief and refers the court to the points and authorities contained therein.

WHEREFORE, BPPNA respectfully requests that the Court consolidate all of the Related Actions, including *Koch*, pursuant to 28 U.S.C. § 1407.  BPPNA further requests transfer of *Koch* to the Northern District of Illinois, where the other eighteen Related Cases are already pending.

Date:    February 27, 2008

Respectfully submitted,

Richard C. Godfrey, P.C.
David J. Zott, P.C.
Andrew A. Kassof
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601-6636
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

*Attorneys for Defendant BP Products North America, Inc.*

2

## BEFORE THE JUDICIAL PANEL ON
## MULTI-DISTRICT LITIGATION

| | |
|---|---|
| In re: | ) |
| | ) |
| BP PRODUCTS NORTH AMERICA, INC. | )    MDL Docket No. _____ |
| ANTITRUST LITIGATION | ) |
| _____ | ) |

### BP PRODUCTS NORTH AMERICA, INC.'S BRIEF IN SUPPORT OF ITS
### MOTION FOR 28 U.S.C. § 1407 TRANSFER

BP Products North America, Inc. ("BPPNA"), the defendant in the case styled *Koch Supply & Trading, L.P. v. BP Products North America, Inc.*, United States District Court for the Southern District of Texas No. 4:08-cv-00377, files this motion for consolidation and transfer of pretrial proceedings under 28 U.S.C. § 1407 so that the recently-filed *Koch* case can be administered along with the eighteen other actions that allege the same causes of action arising out of the same set of alleged facts (the "Related Cases").

Seventeen of the eighteen Related Cases are putative class actions (some of which propose certification of classes that would include plaintiff Koch), that are currently pending in the United States District Court for the Northern District of Illinois before the Honorable James Zagel.[1] To date, Judge Zagel has appointed Interim Class Counsel and has entered separate Case

---

[1]    The eighteenth Related Case - *Amerigas Propane, L.P. et al. v. BP North America, Inc. et al.*, No. 08 C 981 - was filed in the Northern District of Illinois on February 15, 2008. Although it was originally assigned to Judge
(Continued...)

Management Orders for "direct purchasers" and for "indirect purchasers." The current schedules established by Judge Zagel provide ample time and opportunity for the *Koch* case to be consolidated with the other Related Cases before initial motions are decided, and before the parties complete substantial discovery. Judicial economy and conservation of the resources of all parties weigh heavily in favor of transferring the newly-filed *Koch* case to the same Court where the other seventeen Related Cases are already pending so that it may be consolidated with the Related Cases before Judge Zagel. Accordingly, BPPNA respectfully requests that all actions be transferred to and centralized before Judge Zagel in the Northern District of Illinois.

## INTRODUCTION AND PROCEDURAL CONSIDERATIONS

When the *Koch* case was filed on February 1, 2008, seventeen Related Cases arising from the same conduct and making the same allegations had already been consolidated and pending before Judge Zagel, most for one and a half years. Interim Class Counsel had been appointed more than a year earlier, and Judge Zagel had already entered two Case Management Orders — one for "direct purchasers" and one for "indirect purchasers." As shown below, the core purposes of MDL consolidation - the just, efficient and consistent adjudication of overlapping multi-district actions - decisively favors transferring *Koch* to the Northern District of Illinois and there consolidating it with the other Related Cases. Any other result would allow the tail to wag the dog.

---

Darrah, BP America intends to seek transfer of *Amerigas Propane* to Judge Zagel under the Local Rules of the Northern District of Illinois.

I.    **ALL CASES FILED PRIOR TO *KOCH* HAVE BEEN CONSOLIDATED BEFORE ONE JUDGE IN THE NORTHERN DISTRICT OF ILLINOIS.**

     A.    **All of the Related Cases filed prior to Koch were either filed in the Northern District of Illinois, or were voluntarily transferred to the Northern District of Illinois.**

The *Koch* case, like all of the other Related Cases, stems from a single action filed against BPPNA on June 28, 2006 in the Northern District of Illinois by the United States Commodity Futures Trading Commission ("CFTC"). Captioned *U.S. Commodity Futures Trading Commission v. BP Products North America, Inc.*, No. 06 CV 3503 (N.D. Ill.) (Docket No. 1) ("*CFTC v. BP Products*") that case alleges that BPPNA (i) attempted to corner the market for TET propane[2] in April 2003 (*CFTC v. BP Products* Compl. ¶ 6); (ii) built a sizable "long" position during January 2004 in physical February 2004 TET propane (*id.* at ¶ 49); (iii) "cornered" the February 2004 TET physical propane market (*id.* at ¶¶ 1, 3); and (iv) was able to manipulate the price of February 2004 TET physical propane (*id.* ¶ 1).

Within one day of the CFTC's filing *CFTC v. BP Products*, private plaintiffs began filing tag-along actions against BPPNA based upon the same allegations of the CFTC's complaint, and indeed often parroting the CFTC's allegations verbatim. To date, nineteen civil federal actions (including *Koch*) have been filed against BP Products based upon those allegations:

Seventeen of the eighteen filed actions have been pending before a single judge in the Northern District of Illinois. Most have been pending for a year and a half or more:

- *Terry, et al. v. BP Products North America, Inc.*, No. 06 CV 3551, filed June 29, 2006 in the Northern District of Illinois ("*Terry*").

---

[2]   TET refers to the Texas Eastern Transmission Corporation. The term "TET propane" refers to propane that is deliverable at the Texas Eastern Products Pipeline Co., LLC ("TEPPCO") storage facility located in Mont Belvieu, Texas or anywhere within the TEPPCO system. (*CFTC v. BP Products*, N.D. Ill. Case No. 06-cv-3505, Dkt #1, Glossary.)

- *Dennison, et al. v. BP Products North America, Inc., et. al.*, No. 06 CV 3541, filed June 29, 2006 and amended June 30, 2006 in the Northern District of Illinois ("*Dennison*").

- *Levin v. BP Products North America, Inc.*, No. 06 CV 03570, filed June 30, 2006 in the Northern District of Illinois ("*Levin*").

- *SchagrinGAS Co. v. BP Products North America, Inc., et al.*, No. 06 CV 3621, filed July 6, 2006 in the Northern District of Illinois ("*SchagrinGAS*") and consolidated with the other "direct purchaser" actions in a Consolidated Complaint filed March 15, 2007.

- *Withum v. BP Products North America, Inc.*, No. 06 CV 3744, filed July 11, 2006 in the Northern District of Illinois ("*Withum*").

- *Styer Propane, LLC v. BP Products North America, Inc.*, No. 06 CV 3871, filed July 18, 2006 in the Northern District of Illinois ("*Styer Propane*") and consolidated with the other "direct purchaser" actions in a Consolidated Complaint filed March 15, 2007.

- *Sydor v. BP Products North America, Inc.*, No. 06 CV 4188, filed August 3, 2006 in the Northern District of Illinois ("*Sydor*").

- *Cassells, et al. v. BP Products North America, Inc., et al.*, No. 06 CV 3837, filed July 14, 2006 in the Northern District of Illinois ("*Cassells*").

- *Nebel v. BP Products North America, Inc., et al.*, No. 06 CV 4363, filed August 11, 2006 in the Northern District of Illinois ("*Nebel*").

- *White v. BP Products North America, Inc.*, filed July 14, 2006 in District Court of Caddo County, Oklahoma, removed to the Western District of Oklahoma on August 16, 2006, transferred to the Northern District of Illinois and assigned Case No. 06 CV 6994 on November 3, 2006, and transferred to Judge Zagel to be consolidated with the other Related Cases on December 28, 2006 ("*White*").

- *Ridgway v. BP Products North America, Inc.*, filed July 18, 2006 in the Western District of Oklahoma, transferred to the Northern District of Illinois on November 3, 2006, assigned No. 06 CV 6108, and transferred to Judge Zagel to be consolidated with the other Related Cases on January 11, 2007 ("*Ridgway*").

- *Plaut, et al. v. BP Products North America, Inc. et al.*, No. 06 CV 4577, filed August 23, 2006 in the Northern District of Illinois ("*Plaut*").

- *Mowers v. BP Products North America, Inc.*, No. 06 CV 4680, filed August 29, 2006 in the Northern District of Illinois ("*Mowers*").

- *Halpern v. BP Products North America, Inc., et al.*, No. 06 CV 4736, filed August 31, 2006 in the Northern District of Illinois ("*Halpern*").

- *Mehang v. BP Products North America, Inc., et al.*, No. 06 CV 5293, filed September 29, 2006 in the Northern District of Illinois ("*Mehang*").

- *Parke J. Patten, Inc., d/b/a Patten Inc. or Patten's Gas v. BP Products North America, Inc.*, No. 06 CV 5325, filed September 29, 2006 in the Northern District of Illinois ("*Patten*") and consolidated with the other "direct purchaser" actions in a Consolidated Complaint filed March 15, 2007.

- *Guin v. BP Products North America, Inc.*, No. 07 CV 3531, filed June 22, 2007 in the Northern District of Illinois ("*Guin*").

- *Amerigas Propane, L.P., et al. v. BP North America, Inc., et al.*, No. 08 C 981, filed February 15, 2008 in the Northern District of Illinois ("*Amerigas Propane*").

Of the eighteen Related Cases, two (*Ridgway* and *White*) were originally filed in jurisdictions other than the Northern District of Illinois. Counsel for Ridgway filed a Motion for Transfer Under 28 U.S.C. § 1407 before the Panel on August 2, 2006, and sought transfer of all of the Related Cases to the Western District of Oklahoma. BPPNA and plaintiffs in several of the Related Cases responded to Ridgway's Motion on or about August 22, 2006. Before the Panel could hear Ridgway's Motion, counsel for Ridgway agreed to voluntarily transfer the *Ridgway* and *White* cases to the Northern District of Illinois for consolidation with the other Related Cases. Accordingly, the parties submitted a Joint Notice of Recent Activity in Related Cases to the Panel on November 1, 2006, advising the Panel that the voluntary transfer of the *Ridgway* and *White* cases to the Northern District of Illinois rendered the Ridgway Motion moot. The Panel issued an Order deeming the Motion for Transfer withdrawn on November 6, 2006. (JPML Order, Ex. 1) The *Ridgway* and *White* cases were transferred to the Northern District of Illinois on November 3, 2006 (*see* Transfer Orders, Ex. 2), and no other similar case was filed in any jurisdiction other than the Northern District of Illinois until Koch filed its Complaint in the Southern District of Texas on February 1, 2008.

**B.**    **The Court has appointed Interim Class Counsel and entered Case Management Orders in the Related Cases pending in the Northern District of Illinois.**

On September 7, 2006, plaintiffs in several of the Related Cases then pending in the Northern District of Illinois filed a Motion for Finding of Relatedness before Judge Zagel, the judge to whom the first-filed case had been assigned. (Docket Rpt., Ex. 3)  The following week, other plaintiffs sought appointment of Interim Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).  (*Id.*)  After a hearing on September 19, 2006, Judge Zagel granted both Motions, appointed Interim Class Counsel for the "direct purchasers," and gave all interested plaintiffs' counsel until October 3, 2006 to submit an application to be appointed as Interim Class Counsel. (9/19/06 Minute Order, Ex. 4)  On October 17, 2006, Judge Zagel appointed separate Interim Class Counsel for the "indirect purchaser" plaintiffs. (10/17/2006 Order, Ex. 5)  Thereafter, each set of Interim Class Counsel proposed Case Management Orders governing various pre-trial issues in the Related Cases, which were granted. (Docket Rpt., Ex. 3; Indirect Purchaser CMO, Ex. 6; Direct Purchaser CMO, Ex. 7)

On March 19, 2007, the United States Department of Justice moved to intervene and to stay proceedings in the Northern District of Illinois for six months pending the conclusion of a criminal investigation involving the facts underlying the Related Cases.  Judge Zagel granted the Motion on March 27, 2007 (3/27/07 Order, Ex. 8), and granted a further Motion for extension of the stay on September 28, 2007. (9/28/07 Order, Ex. 9)

The stay was lifted on November 26, 2007.  Since then, the "direct purchaser" plaintiffs and BPPNA have agreed upon and proposed to Judge Zagel a schedule for filing Consolidated Complaints, answering or otherwise pleading in response thereto, and conducting discovery in advance of a Motion for Class Certification. (*See* Agreed Motion, Ex. 10)

6

## II.    28 U.S.C. § 1407(a) CONSOLIDATION IS PROPER.

The purpose of § 1407(a) is to ensure the just, efficient, and consistent conduct and adjudication of actions pending in multiple districts by providing for the centralized management of pretrial proceedings under a single court's supervision. *See* 28 U.S.C. § 1407(a).  In deciding whether to consolidate, the Panel assesses whether centralization will (1) avoid the possibility of conflicting pretrial rulings; (2) eliminate or reduce duplicative discovery; and (3) conserve the efforts and resources of the parties, their counsel, witnesses, and the judiciary.  *See, e.g., In re Seroquel Prods. Liab. Litig.*, MDL No. 1769, 477 F. Supp. 2d 1376, 1378-79 (J.P.M.L. 2006); *In re Ephedra Prods. Liab. Litig.*, 314 F. Supp. 2d 1373, 1375 (J.P.M.L. 2004); *In re Deere & Co. Cotton Picker Fire Prods. Liab. Litig.*, No. 1282, 1999 U.S. Dist. LEXIS 10664, at **2-3 (J.P.M.L. July 13, 1999).  Each of these considerations decisively favors MDL consolidation here.

### A.    Transfer Will Avoid the Possibility of Conflicting Pre-Trial Rulings.

Centralization will avoid the possibility of conflicting pre-trial rulings.  Koch is asserting the same claims that are being asserted in the other direct purchaser Related Cases, and indeed is a member of several of the putative classes in the Related Cases.  Dispositive and other motions asserted by BPPNA and/or plaintiffs in the various cases will require resolution of essentially the same issues of fact and law. *See In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (noting that overlapping legal issues counsel in favor of transfer).  Issues relating to BPPNA's alleged conduct that arise in pretrial motions can and should be determined by one judge, in one proceeding. *See In re Phonometrics, Inc. Elec. Long Distance Call Cost Computer & Recorder Patent Litig.*, No. 1141, 1996 U.S. Dist. LEXIS 21909, at *3 (J.P.M.L. Dec. 11, 1996) (ordering transfer to "prevent inconsistent pretrial rulings").  There is no reason why multiple federal judges should have to address and decide the same motions, with

potentially conflicting results. As noted, the parties in the direct purchaser Related Cases have already agreed to a schedule for filing Consolidated Complaints and responsive pleadings, including motions to dismiss.

    **B.**    **Transfer Will Eliminate or Reduce Duplicative Discovery.**

The *Koch* case and the Related Cases are all premised on the same asserted misconduct, involving the same actors, and built on the same legal theories. Without question, *Koch* and the Related Cases will involve largely duplicative discovery requests and require discovery of the same documents and witnesses. Absent coordination or consolidation, BPPNA would be required to respond to multiple requests for the same information, and witnesses would be required to submit to multiple depositions. Moreover, absent centralization, disputes over such discovery would be largely duplicative and district courts of coordinate jurisdiction deciding discovery disputes may reach contradictory conclusions. Transferring and coordinating will allow disputes to be argued and resolved just once. *See, e.g., In re Ocean Fin. Corp. Prescreening Litig.*, MDL No. 1778, 435 F. Supp. 2d 1350, 1351-52 (J.P.M.L. 2006) (holding that centralization would eliminate duplicative discovery where the plaintiffs brought claims on behalf of overlapping putative classes); *In re Teflon Prods. Liab. Litig.*, 416 F. Supp. 2d 1364, 1365 (J.P.M.L. 2006) (holding that transfer was necessary to eliminate duplicative discovery).

    **C.**    **Transfer Will Conserve the Efforts and Resources of the Parties, Their Counsel, Witnesses, and the Judiciary.**

By eliminating or reducing duplicative discovery and avoiding the possibility of conflicting pretrial rulings, centralization will substantially reduce the efforts and expenditure of resources by all parties involved. It would defeat the core purpose of MDL consolidation to require two or more federal judges to preside over the same claims involving the same parties. Because the same BPPNA documents and witnesses will be involved, document production and

other written discovery should be provided once through coordinated discovery, and depositions should proceed once as to all parties instead of numerous times with the need to resolve the scheduling conflicts that no doubt would occur. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 422 (J.P.M.L. 1991). Moreover, transfer of these actions for coordinated pretrial proceedings will not unfairly prejudice the plaintiff. Discovery has not yet commenced in either the Related Cases or in the *Koch* case. Because there has been no production of discovery and no factual or legal issues have been adjudicated to date, there are no practical impediments to expedient coordination and the implementation of uniform pre-trial procedures and scheduling.

## III.    THE NORTHERN DISTRICT OF ILLINOIS IS THE PROPER FORUM FOR THESE CASES.

As the named plaintiffs in eighteen actions and their counsel have already recognized, the Northern District of Illinois is the proper forum for all of the Related Cases, including *Koch*. All eighteen other named plaintiffs who seek damages for the same or similar claims, based upon the same factual allegations, have either filed their cases in the Northern District of Illinois, or have agreed to transfer their cases to that jurisdiction. *Koch* seeks to be the sole outlier, apparently to gain a tactical advantage by threatening the prospect of duplicative discovery and conflicting rulings. There is no reason that *Koch* should be permitted to litigate the same claims against the same defendant in a different forum.[3] The Panel has considered the district where the most cases have been filed to be a persuasive factor in determining an appropriate location for centralization. *See, e.g., In re Series 7 Broker Qualification Exam Scoring Litig.*, 444 F. Supp.

---

[3]    If Koch is permitted to pursue a duplicative action in another forum, no doubt other potential plaintiffs will be encouraged to try the same gambit, further multiplying the number of duplicative actions pending in different fora.

9

2d 1330, 1332 (J.P.M.L. 2006) (centralizing cases in the District Court for the District of Columbia, where the largest number of scheduled actions were pending and the district was home to the defendant's headquarters); *In re Methyl Methacrylate (MMA) Antitrust Litig.*, 435 F. Supp. 2d 1345, 1347 (J.P.M.L. 2006) (the Eastern District of Pennsylvania was the appropriate forum where the first case was filed and most of the actions were pending there); *In re Profiler Prods. Liab. Litig.*, 429 F. Supp. 2d 1381, 1382 (J.P.M.L. 2006) (the Southern District of Illinois was the appropriate transferee forum when "a sizeable number of plaintiffs" had filed their actions there).

BP Products is headquartered in Illinois (*CFTC v. BP Products*, N.D. Ill. Case No. 06 CV 3503, Dkt. No. 1, Compl. ¶ 13), which the Panel has also identified as an important factor when determining the proper forum for MDL proceedings. *See, e.g., In re Delta Air Lines, Inc.*, 170 F. Supp. 2d 1359, 1360 (J.P.M.L. 2001) (observing that "pertinent documents and witnesses" are usually located at the defendant's principal place of business); *In re Amsted Indus. Inc. "ERISA" Litig.*, 162 F. Supp. 2d 697, 698 (J.P.M.L. 2001) (transferring cases to the Northern District of Illinois, the district in which the defendant's headquarters were located); *In re "Factor VIII or IX Concentrate Blood Prods." Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) (transferring cases to the Northern District of Illinois where one principal defendant was headquartered in Illinois).

In addition, "[c]onvenience of counsel often coincides with convenience of the parties they represent and is a factor to be considered under Section 1407." *In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 476 F. Supp. 445, 449 n.4 (J.P.M.L. 1979). In that regard, BPPNA is represented in these actions by Kirkland & Ellis LLP in Chicago. In all of the cases filed in or previously transferred to the Northern District of Illinois, the plaintiffs already have

10

retained Illinois counsel who can conveniently appear to represent them in Chicago. And Judge Zagel has appointed Interim Class Counsel in Illinois and in close proximity to Illinois for the purpose of representing the putative classes during pretrial proceedings to be conducted in Illinois. (*See* Order, Ex. 6)

Finally, the Northern District of Illinois is experienced in handling MDL proceedings. *See, e.g., In re African-American Slave Descendants Litig.*, MDL No. 1491; *In re Aimster Copyright Litig.*, MDL No. 1425; *In re Synthroid Mkting. Litig.*, MDL No. 1182.

The Northern District of Illinois thus provides the appropriate forum for these cases.

## CONCLUSION

For all of the foregoing reasons, BPPNA respectfully requests that the Court consolidate all of the Related Actions, including *Koch*, pursuant to 28 U.S.C. § 1407. BPPNA further requests transfer of *Koch* to the Northern District of Illinois, where all eighteen Related Cases are pending.

Date:    February 27, 2008                    Respectfully submitted,

                                             Richard C. Godfrey, P.C.
                                             David J. Zott, P.C.
                                             Andrew A. Kassof
                                             KIRKLAND & ELLIS LLP
                                             200 East Randolph Drive
                                             Chicago, Illinois 60601-6636
                                             Telephone:    (312) 861-2000
                                             Facsimile:     (312) 861-2200

                                             *Attorneys for Defendant BP Products North America, Inc.*

11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **KOCH SUPPLY & TRADING, L.P.,** | : |
| **Plaintiff** | |
| | |
| **v.** | Civil Action No. 4:08−cv−00377 |
| | |
| **BP PRODUCTS NORTH AMERICA, INC.,** | |
| **Defendant.** | |

**PROPOSED ORDER**

Upon consideration of Defendant BP Products North America's MOTION TO STAY

PROCEEDINGS PENDING ACTION BY THE JUDICIAL PANEL ON MULTIDISTRICT

LITIGATION, this Court hereby GRANTS Defendant's motion and ORDERS that the above-

captioned matter be stayed pending action by the Judicial Panel on Multidistrict Litigation on

Defendant's 28 U.S.C. § 1407 Motion to Transfer and further order of this Court.

_____
DATE

_____
Nancy F. Atlas
United States District Judge